[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 8, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-12841
Non-Argument Calendar

_____

D. C. Docket No. 03-60474-CV-WJZ

BRUCE DAVID BURSTEIN, M.D.,

Plaintiff-Appellant,

versus

EMTEL, INC.,
d. b. a. JFK Emergency Physicians,
KENNETH SCHEPPKE,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 8, 2005)

Before EDMONDSON, Chief Judge, TJOFLAT and DUBINA, Circuit Judges.

PER CURIAM:

Bruce David Burstein, M.D., appeals the district court's order granting summary judgment in favor of Emtel, Inc., and Kenneth Scheppke in this action claiming (1) race/ethnicity discrimination, under 42 U.S.C. § 1981, (2) religion-based discrimination, under Title VII, 42 U.S.C. § 2000e et seq., and the Florida Civil Rights Act (FCRA), Fla. Stat. Ann. § 760.01 et seq., and (3) retaliation, under § 1981, Title VII, and the FCRA. We affirm the district court's grant of summary judgment in favor of Scheppke and Emtel on Burstein's discrimination claims. But we vacate the district court's grant of summary judgment in favor of Emtel on Burstein's retaliation claims.

BACKGROUND

Burstein, an emergency room physician who is Jewish, began working at the emergency department at JFK Hospital in Atlantis, Florida, in January 1999, under a contract with PhyAmerica, which contracted to supply services to JFK. PhyAmerica lost its contract with JFK in 2001; and Emtel, a physician management group, sent Burstein a letter proposing to engage him as an emergency room doctor at JFK. Because of a noncompete clause in Burstein's PhyAmerica contract, he instead entered into a one-year independent contractor

2

agreement directly with JFK on 29 November 2001.[1]  Burstein also worked shifts in the emergency department at another hospital, Martin Memorial.

On 4 November 2002, Burstein submitted an e-mail requesting shifts at JFK for December 2002.  At this point, Burstein already knew his scheduled shifts at Martin Memorial.  To meet his obligations at both hospitals, Burstein on 8 November sent an e-mail to Scheppke[2] requesting a shift change where Burstein would work Scheppke's 1 and 2 December shifts, and Scheppke would work Burstein's 22 and 23 December shifts.  According to Burstein, on 11 November, Scheppke responded in a "hostile and prejudiced fashion" by degrading Burstein's religion, questioning how he spent the holidays, and calling him "a Jew."  Burstein then cursed Scheppke and immediately reported the incident to Dr. Caswell Rumball, the emergency department director.[3]

---

[1] Emtel and Burstein executed a "Florida Physician's Engagement Letter" in October 2001 contemplating Emtel's employment of Burstein to work at JFK.

[2] Burstein and Scheppke applied in February 2002 for the position of assistant director of the JFK emergency department.  Scheppke was selected.

[3] Burstein recalled the argument,

> It started off by my asking him on our return from breakfast if he had read my e-mail. He said he did and quite frankly he answered that I needed to set my priorities straight, that I should first fulfill my obligation to JFK Medical Center.
>
> And then abruptly he said, "What religion are you?"  And I said, "Ken, I don't think that's an appropriate question."  He said, "No, I think it's very appropriate; what religion are you?"  I said, "Ken, I don't think it's your business or this department's

On 15 November, Burstein received an email from Rumball with an attached draft copy of the Emtel employment agreement.  Also on 15 November, Burstein sent a letter to Dr. Joseph Degioanni, Emtel's chief executive officer, complaining of (1) Scheppke's acts in questioning Burstein's religion, and (2) Rumball's failure to resolve the situation.

---

business what religion I am."

He went on and on and on walking down the hall asking what religion I was, very hostile.  I said, "Ken, I'm not answering that."  We walked into the nursing lounge and we sat at the table.  And he asked me again, "What religion are you?"  He was adamant.  I said, "I don't think it's relevant."  He said, "I think it's very relevant."

He said, "What do you do on Christmas?"  I said, "I don't think it's your business."  He said, "What does your family do on Christmas?"  I said, "Christmas is a time that I like to spend with my family.  It's very few times that my kids are off school and I like to spend time with them."  He said, "That's what summer vacation is for."  I said, "Ken, Christmas vacation has become secularized, it's called winter recess, and to postpone seeing your family until summer is kind of ridiculous.  I think physician parents should be given consideration in scheduling for the Christmas break off."

He then said that I'm not a team player, and he says he works the Jewish holidays so I can be off and he would expect that I would work Christmas so he can have off.  And he suggested I should look for another job.

And finally, he looked me right in the eyes and it made me sick, and he said, "You are a Jew."  And I stood up, and I threw my food in the garbage can and I said, "---- you.  My wife and kids celebrate Christmas.  They grew up Catholic.  Every year we have a nine-foot Christmas tree, and it's none of your ---- damn business."  And he looked at me and he stood up right in my face and said, "I'm writing you up."  I couldn't believe it.

On 25 November, Rumball met with Degioanni to discuss Rumball's concerns with Burstein's attitude and performance.[4]  Rumball prepared a document listing a number of concerns.  Under the heading "Anger and hostility", Rumball briefly remarked on the Burstein-Scheppke argument and stated, "[Burstein] subsequently raised accusations of religious bias, accusations that were refuted in subsequent discussions with Sandra Whitfield [director of the JFK emergency room] and myself . . . ."

On 27 November, Emtel's counsel sent Burstein a letter informing him that he would not be offered a contract with Emtel when his JFK contract expired at the end of that month.  Other doctors whose contracts Emtel was not going to pick up received 90 days' notice.

DISCUSSION

---

[4] Rumball stated that he was concerned with (1) Burstein's proposed December schedule, which Rumball thought requested an unreasonable number of days off in the light of a physician staffing shortage; (2) Burstein committing an insubordinate act: e-mailing department staff, after the emergency room department centralized its staffing in September 2002, and stating that the department would return to its prior division; (3) what Rumball considered to be Burstein's intentional failure to examine a boy later diagnosed with appendicitis; and (4) Burstein's perceived scheduling inflexibility, which was what Rumball -- after speaking to Scheppke and Sandra Whitfield (director of the JFK emergency room) -- deemed was the cause of the argument between Scheppke and Burstein.

5

We review the district court's rulings on a motion for summary judgment <u>de novo</u>; we view all evidence and factual inferences in the light most favorable to the non-moving party. <u>Miller v. King</u>, 384 F.3d 1248, 1258-59 (11th Cir. 2004). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Burstein argues that Scheppke may be held liable under § 1981 because Scheppke allegedly influenced Rumball's decision not to recommend Burstein for employment: Scheppke thus was an integral part of the decisionmaking process ending in Emtel's decision not to offer Burstein a contract.[5]

We disagree: we see no reason to hold Scheppke liable under a discrimination or retaliation theory. The record does not suggest that Scheppke participated in the decision of Emtel not to offer Burstein a contract. <u>See</u> <u>Quinn v. Monroe County</u>, 330 F.3d 1320, 1326-28 (11th Cir. 2003) (writing, in First Amendment retaliation case, that an individual may be liable under the civil rights

---

[5] Appellees argue that Burstein's § 1981 claims fail because purely religion-based discrimination and retaliation claims are not cognizable under § 1981. The district court refused to grant summary judgment on this issue, noting that (1) § 1981 protects against discrimination based on ancestry and ethnicity, and (2) Jewish religion and ethnicity often are tied closely. But Appellees did not file a cross-appeal: we do not consider this issue. <u>See</u> <u>Wexler v. Lepore</u>, 385 F.3d 1336, 1338 n.3 (11th Cir. 2003).

6

laws for decisions he personally is involved in making). Scheppke participated in the 11 November argument with Burstein, threatened to "write up" Burstein, and (like Burstein) discussed the matter with Rumball. But nothing shows that Scheppke actually did "write up" Burstein; and Rumball and Degioanni stated clearly that Scheppke did not participate in their decision not to offer a contract to Burstein. Nothing in the record suggests that these statements are unbelievable.

Burstein next submits that he established that Emtel's explanations for withdrawing his contract were a pretext for discrimination and retaliation.[6]

In cases involving circumstantial evidence of discrimination or retaliation under Title VII and § 1981, courts use the analytical framework set forth in McDonnell Douglas Corp. v. Green, 93 S.Ct. 1817, 1824-25 (1973), which requires the plaintiff first to demonstrate a prima facie case of discrimination or retaliation. See Cooper v. Southern Co., 390 F.3d 690, 724-25 (11th Cir. 2003) (Title VII and § 1981 discrimination claims); Goldsmith v. City of Atmore, 996

---

[6] We reject Burstein's argument that Scheppke's statements during their argument -- either by themselves or as referred to in Rumball's memorandum -- constitute "direct evidence" of discrimination or retaliatory attitude. Scheppke did not participate in Emtel's decision not to offer a contract to Burstein. And Rumball's memorandum does not show -- without inference -- that Burstein's religion or his complaint of religious discrimination was the cause of Emtel's refusal to offer a contract to Burstein. See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004) (statement that suggests, but does not prove, discriminatory motive is not direct evidence).

F.2d 1155, 1162-63 (11th Cir. 1993) (Title VII retaliation claim).[7]  The defendant

then may rebut the prima facie case by offering a legitimate, nondiscriminatory

reason for the employment act.  If the defendant rebuts the plaintiff's prima facie

case, the plaintiff must come forward with evidence sufficient to show that the

employer's proffered reasons are pretextual.  Cooper, 390 F.3d at 725; Goldsmith,

996 F.2d at 1163.

No one seriously disputes that Burstein presented a prima facie case of

discrimination and retaliation.[8]  And Emtel presented many legitimate reasons why

it decided not to offer Burstein a contract, including (1) Rumball's belief that

Burstein intentionally refused to see a patient; (2) Burstein's perceived

unreasonable scheduling requests and lack of loyalty to JFK; (3) Burstein's

insubordination to Scheppke and his disruption of the emergency department

during the 11 November argument; and (4) Burstein's perceived attempt to

undermine the centralization of the department.  Emtel's subsequent offering of a

contract to Burstein – on 15 November, when Emtel knew of all these matters --

---

[7] Florida courts apply federal case law interpreting Title VII to FCRA claims.  Fla. State Univ. v. Sondel, 685 So. 2d 923, 925 n.1 (Fla. 1st Dist. Ct. App. 1996).  We analyze Burstein's FCRA claims concurrently with his Title VII and § 1981 claims.

[8] Burstein contends that the district court erred in failing to modify the McDonnell Douglas analysis with the Supreme Court's decision in Desert Palace, Inc. v. Costa, 123 S.Ct. 2148 (2003). But we recently reasserted the applicability of McDonnell Douglas.  See Cooper, 390 F.3d at 725 n.17.

might appear suspicious. This fact, however, does not show that Emtel's reasons were a pretext for religious <u>discrimination</u>.

But we agree with Burstein's argument that he has created a genuine issue of material fact on whether Emtel's reasons for withdrawing his contract were a pretext for <u>retaliation</u>. He points to (1) Emtel offering him a contract before he complained of religious discrimination, but withdrawing its offer after he complained, and (2) Rumball specifically identifying Burstein's discrimination complaint under one of Rumball's points of concern.

We again note that Emtel offered reasonable explanations for why it would not wish to employ Burstein. The problem is with the timing of the events. On 14 November, Emtel was aware of the facts underlying its explanation for refusing to offer a contract. But on 15 November, Emtel offered a contract to Burstein. That day, Burstein complained of discrimination.[9] Then, on 25 November, Rumball and Degioanni met to discuss Rumball's concerns about Burstein. These concerns included a written reference to the fact that Burstein had filed a complaint of religious discrimination against Scheppke. In other words, in full awareness of its concerns with Burstein, Emtel offered him a contract. But with the addition of one

---

[9] It is unclear which event happened first on 15 November. But at the summary judgment stage, we view all factual inferences in favor of Burstein, the non-moving party.

fact -- Burstein filing a discrimination complaint -- the record supports an inference that Emtel then decided not to hire him. In sum, Burstein has shown a basis for a mixed-motive retaliation claim: a reasonable jury might believe that Emtel relied on both legitimate and illegitimate grounds in deciding not to hire him.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.