**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 30, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JENNIFER FURAUS,

      Plaintiff - Appellant,

v.

CITADEL COMMUNICATIONS
CORPORATION,

      Defendant - Appellee.

No. 03-2146
(D.C. No. CIV 02-444 LH/LFG)
(D. N.M.)

**ORDER AND JUDGMENT**[*]

Before **SEYMOUR, HOLLOWAY**, and **BRISCOE**, Circuit Judges.

Jennifer Furaus sued her former employer, defendant - appellee Citadel

Communications Corporation (Citadel or defendant), for unlawful gender discrimination

under the New Mexico Human Rights Act and Title VII of the Civil Rights Act of 1964,

42 U.S.C. §§ 2000e *et seq*. (2002). Citadel owns and operates a radio station in

Albuquerque, where Furaus worked as a radio announcer. The district court granted

summary judgment for Citadel on the grounds that it demonstrated legitimate business

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. This court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

reasons for its allegedly discriminatory conduct and that Furaus failed to show that those reasons were pretextual under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Furaus now appeals. Our jurisdiction is based on 28 U.S.C. § 1291.

## I

We will discuss now the facts developed in the record and the district judge's conclusions drawn from them which led to his grant of summary judgment for the defendant.

Furaus was employed for three years, from July 1998 to July 2001, as an announcer for a radio station owned by defendant Citadel, KGMA ("Magic 99.5") in Albuquerque, New Mexico. During her term of employment, Furaus (who used the name Jenna James in broadcasts), Roger Gettler and Phil Moore were the announcers for the station. Moore did the live morning show Monday through Friday, 5:30 to 10:00 a.m.; Furaus did the mid-day show live Monday through Friday, 10:00 a.m. to 3:00 p.m.; and Gettler did the late afternoon show, mostly live, Monday through Friday, 3:00 to 7:00 p.m., with the last hour pre-recorded. Moore pre-recorded one show to be aired on Saturday mornings; Furaus pre-recorded two shows to be aired mid-day on both Saturdays and Sundays; and Gettler pre-recorded two shows to be aired on both Saturday and Sunday late afternoons. The radio station aired a syndicated show on Sunday mornings so it did not need an announcer to pre-record a show for that slot. The pre-

recording process required the announcer to spend approximately 20 to 45 minutes to prepare a show, which would air for approximately five or six hours.

Gettler earned a base salary of $44,100 in 2000, and $46,300 in 2001. Besides serving as a radio announcer, Gettler was also program director and direct supervisor over both Moore and Furaus. Moore earned a base salary of $39,690 in 2000 and $41,675 in 2001. Furaus earned a base salary of $24,333 in 2000, and she would have earned $25,000 in 2001 if she had stayed the entire year.

A radio station's revenues come from advertising, and advertisers want to know how large an audience a station is reaching in making decisions about whether to advertise on radio and on which station or stations to advertise. To satisfy the need for this kind of information, defendant turned to a company called Arbitron, which conducted "ratings" four times a year; the resulting ratings are called "books." The spring and fall were regarded as more important than the other ratings periods. It appears that Arbitron rated individual time slots, as well as the overall station, according to different demographic profiles (for instance, "Persons [aged] 25-54," or "Women [aged] 25-54"). The ratings can be quantified as an ordinal ranking – *i.e.*, the station is placed first, second, or third in a particular listener demographic – or as a percentage of the market share of that demographic during a particular time slot.

Furaus claims that among most radio stations the morning show is usually the highest rated show. Magic 99.5 was atypical, however, in that Furaus's mid-day show

received higher ratings than the morning or late afternoon shows.  When Furaus worked at Magic 99.5, she claims that her show earned her employer higher revenues than the male announcers' shows.  We do not accept this assertion.[1]  The record simply does not reveal whether, and to what extent, plaintiff's higher ratings resulted in higher revenues for the station.

According to his employment contract with Citadel, Gettler was eligible for bonuses for each book based on the ratings of the entire station (all time slots) for the focus groups Persons 25-54 and Women 25-54.  There were different bonus scales for the two demographics, and Gettler's entitlement to bonuses was based on the station's ordinal rankings in those two groups.  Between November 2000 and November 2001, Gettler received bonuses totaling $5,500.

Moore's employment contract, similarly, allowed bonuses for each book based on the ratings of his show in the demographics of Persons 25-54 and Women 25-54.  Again there were different bonus scales for the two demographics, and Moore's entitlement to

---

[1]The district judge concluded that Mr. Moede, on whose testimony plaintiff relied for this point, "did not have personal knowledge about Plaintiff's case[,] did not work at Citadel in July 2001, when many of the events in this case took place, and he was never involved in determining the salaries or bonus structures of either Moore or the Plaintiff." Memorandum and Opinion at 20.  The judge concluded, for the purposes of summary judgment only, that Moede was qualified to read the Arbitron print-outs, which he did during his deposition.  The judge held, however, that "to the extent he uses the print-outs to interpret the value of Plaintiff as an employee and to comment on the conduct of Defendant, Mr. Moede's statements will not be considered." *Id.*  As Citadel correctly notes, Furaus does not contest the district court's evidentiary decision on this point and has therefore waived the issue.

bonuses was based on ordinal rankings. Between November 2000 and November 2001, Moore received bonuses totaling $3,550.00.

There is no evidence in the record that Furaus had a written employment contract. On Nov. 7, 2000, Gettler sent Furaus a memo informing her that she had earned a $300 bonus based on the 2000 Summer Book in the demographic of Persons 25-54.

During most of Furaus's employment with Magic 99.5, the station played "soft rock" music. About March 2001, Citadel decided to change the format of the station. Furaus was directed to add energy to her live shows, including spending more time on the air talking with telephone callers and discussing current events, such as celebrity award shows and weddings. Gettler told Furaus on a number of occasions, orally and in writing, to increase her energy and talk more when she was on the air, in order to fit in with the new format. Gettler also criticized Furaus for not arriving at the station a full half-hour before her on-air shift was to begin in order to conduct the research necessary to have topical information to discuss on the air.

In June 2001, Furaus requested two days of vacation to attend a wedding. According to Citadel, this created a problem because June is part of the "spring book," a critical ratings period. Gettler asked Furaus to pre-record two shows to be aired while she was gone. Moore has never been asked to pre-record shows before he took a vacation, but he has never taken a vacation during the spring or fall book period.

On June 26, 2001, Gettler sent Furaus a memo telling her that her performance

needed improvement in the following areas: on-air energy, talking more and not relying on "liners,"[2] and her arrival time.  On July 7, 2001, Gettler sent another memo, praising Furaus for her improvement and identifying areas where she could still be better.  In that memo Gettler wrote: "Keep it up."  Gettler testified in his deposition that he noticed an immediate drop in Plaintiff's performance in these areas right after he had issued the July 7, 2001 memo.  On July 12, 2001, at the direction of Citadel's upper management, Gettler placed Furaus on probation for a minimum of two weeks because of poor or inconsistent performance under the new format.

On July 16, 2001, after trying to initiate a discussion about the probation with manager Kris Abrams and being directed to take the matter up with Gettler the next day, Furaus walked out of the station and later sent a resignation letter.

## II

### A

Plaintiff Furaus contends that the evidence she produced in the district court was sufficient to support at least the inference that gender discrimination was one motivating factor in her treatment, even if not the only factor, and that this case therefore should be treated as a mixed motive case under the authority of *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).  Furthermore, plaintiff argues that the Supreme Court held in *Desert*

---

[2]A "liner" was described as a standard statement about the radio station, such as "99.5 Magic FM, continuous soft rock with less talk." Aplt. App. at 49.

*Palace Inc. v. Costa*, 539 U.S. 90 (2003), that the *McDonnell Douglas* framework is inapplicable to mixed motive cases and that her showing of mixed motive was sufficient to entitle her to a jury trial.

We do not reach that issue. The Court in *Desert Palace* decided only that direct evidence was not necessary to make out a mixed motive case and said nothing at all about the *McDonnell Douglas* analysis. It is true that some courts and commentators have viewed the *Desert Palace* holding as requiring either a departure from or a modification of the *McDonnell Douglas* framework. *See, e.g., Carey v. Fedex Ground Package System, Inc.*, 321 F. Supp.2d 902, 914-17 (S.D. Ohio 2004) (collecting cases and discussing three alternative views as to whether and how *Desert Palace* has affected the validity of the *McDonnell Douglas* analysis). Ms. Furaus, however, did not raise any mixed motive theory in the district court. Although *Desert Palace* was not decided until a few days after judgment had been entered against her in the district court, plaintiff could still have preserved the issue but failed to do so. And because she limits her argument on appeal against application of *McDonnell Douglas* to her newly minted mixed motive theory, which she failed to preserve, we proceed to address her alternative argument – that the district court erred in applying the established mode of analysis.

**B**

Furaus's primary claim appears to be that of discrimination in salary. As to this claim the district court held that plaintiff had succeeded at the first stage in establishing

her prima facie claim by comparison of her salary and bonus structure to that of Mr. Moore. In so holding, the judge rejected defendant's contention that Mr. Moore and Ms. Furaus were not similarly situated because they performed in different time slots and because of Mr. Moore's higher level of experience and greater length of service with the defendant. The district judge noted that the plaintiff's burden at the first step in the *McDonnell Douglas* analysis is not intended to be onerous, and that considerations of factors like those raised by the defendant at this step has been held inappropriate because it may remove plaintiff's opportunity to show that the proffered reasons are merely pretext for discrimination, as we said in *Ortiz v. Norton*, 254 F.3d 889, 894 (10th Cir. 2001). Further, the judge found that plaintiff Furaus and Moore were radio announcers at the station during the same time, that they both presented live shows on week days and recorded shows on weekends, they were both salaried employees, and both were under Gettler's supervision.

We agree with the district court that this was a sufficient showing for plaintiff at the prima facie stage. The points raised by defendant are, however, sufficient to carry its burden of production in the second step of the analysis as gender neutral explanations for the actions taken.

Thus, we turn to the parties' arguments on whether plaintiff carried her burden of showing that the proffered explanations were merely pretext for gender bias. "The factfinder is entitled to infer from any weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered reasons for its action that the employer did not act pursuant to those reasons." *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1112 (10th Cir. 2005) (internal quotation marks omitted). A showing of pretext is sufficient to permit, but not to require, a finding that the real motive was unlawful bias. *Exum v. U.S. Olympic Committee*, 389 F.3d 1130, 1135 (10th Cir. 2004).

Defendant Citadel identified several factors to justify the significant difference in compensation between Ms. Furaus and Mr. Moore. (We agree with the district judge and the defendant that comparison to Mr. Gettler is inappropriate, since he was plaintiff's direct supervisor and so not similarly situated.) Mr. Moore had additional duties as the morning "drive time" host, and he had 20 years' experience compared with plaintiff's five. He also had greater length of service with defendant by about five years. Moreover, defendant's evidence was that the morning show is generally regarded in the industry as the most important, which enables a successful morning host to command a higher rate of pay.

Plaintiff's rebuttal – her attempt to show pretext – was primarily that the evidence showed this station to have been an atypical one in that her show was the higher rated of the two shows being compared. The district judge was unimpressed with this evidence, observing that he did not see how this fact tended to show that defendant's proffered explanation was false or unworthy of belief. We likewise conclude that plaintiff's argument does not withstand scrutiny.

The gist of plaintiff's case, as we understand it, is that her performance was good and perhaps even stellar by the objective measure of audience reaction, even if not completely satisfactory to the station's management. A jury could reasonably infer that the purpose of the radio station is to make a profit, that profits come from advertising, and that companies using radio for advertising wish to reach as many people as possible and are more likely to buy advertising or to pay more for advertising on shows which reach a greater audience. We conclude that this analysis is not sufficient to show pretext.

The district court ruled that the testimony submitted by plaintiff to show that her ratings translated into profits was inadmissible. Although plaintiff asserts that her show was the most profitable one carried by the station, she has not challenged the district court's evidentiary ruling,[3] nor has she directed us to any other evidence to support her assertion. Consequently, we have no evidence as to the rates the station was able to charge for advertising during Moore's morning show as compared with the rates charged during plaintiff's midday show. And even taking the evidence in the light most favorable to plaintiff, which we must, we simply see no rebuttal of defendant's point that the host of the morning show is able to command greater compensation because it is customary in the industry.

---

[3]In her reply brief, plaintiff asks us to review the evidence without deference to the trial court's rulings, contending that this is the meaning of de novo review. This is specious, and the only authority cited in support is not at all apposite to our review of a district court's grant of summary judgment.

Plaintiff also argues in this appeal that she had been treated less favorably than her colleague, Mr. Moore, by having to pre-record one more show per week than he was required to do; by once having to pre-record shows to air when she went on vacation; by having to come to the station once when she had been sick to pre-record a program; by having to perform the task of merging "commercial logs" and "music logs" for Mr. Gettler when he was not in the office, a task that required her to stay at the station for some minutes after her on-air shift had concluded; by having her music programming responsibilities withdrawn in August 2000; and finally, by having been placed on probation in July 2001.

Plaintiff concedes that defendant carried its burden of production to show a neutral business reason for each of these actions. She argues that her evidence of the high ratings of her show demonstrated pretext and should have enabled her to go to trial on the issues. We disagree that the ratings earned by her performance is evidence of pretext in the circumstances of this case. Plaintiff offers no argument in her briefs to support her assertion of pretext based on her program's rankings, and we note that any connection between these instances and her ratings is even less apparent than the asserted connection between her compensation and her ratings. We cannot agree with plaintiff's argument that the district court's conclusion on this issue was in error.

We do think one other argument merits discussion. With respect to what would appear to be the most serious of these actions by the employer, the probation announced

just before plaintiff resigned, plaintiff points to one other bit of evidence, the expression of disagreement with this decision by her immediate supervisor, Mr. Gettler.

Mr. Gettler testified that he disagreed with the decision to put plaintiff on probation:

> Q. Looking back on it, do you think this probationary period was justified?
>
> A. You know, it's hard to say. We were given directives. And whether those directives were necessary for the station to improve or not, we do what we're told. And if Jenna was not able to execute the directives, then the probation was necessary.
>
> Q. So it wasn't for you to determine whether or not it was justified? That's what you're saying?
>
> A. Yeah. I followed my job orders.
>
> Q. Looking back on it, though, do you believe that perhaps those who were telling you what to do were unjustified in their approach?
>
> A. Completely.

Aplt. App. at 75.

It was certainly within the province of management to insist on compliance with the demands made on Ms. Furaus, whether or not the decision represented sound business judgment. The reasonableness of management decisions is not the subject of the civil rights laws, as we have observed countless times. Because this evidence raises no inference that management's decision – whether fair or unfair, wise or unwise – was

motivated by unlawful bias, it is unavailing.[4]

      The judgment of the district court is **AFFIRMED.**

ENTERED FOR THE COURT

William J. Holloway, Jr.
Circuit Judge

---

[4]As noted at the beginning of this order, the plaintiff-appellant asserted her claims under both Title VII of the Civil Rights Act of 1964 and the New Mexico Human Rights Act. N.M. Stat. Ann. § 28-1-13(A) (Michie 2002). Arguments and authorities are not specifically developed by plaintiff-appellant on the state law claims. There is a conclusory request at the end of her Reply Brief, p. 7, for remand of the case for a trial on the counts for sex discrimination under Title VII and the New Mexico Human Rights Act. Apparently the parties treated the federal and state law as applying the same principles, and the district judge expressed the same view. Memorandum Opinion and Order at 7. Hence what we have said concerning the federal law principles also disposed of the state law claims for the same reasons.