*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0242p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

TODD A. WHITE,

       *Plaintiff-Appellant,*

    *v.*

       No. 07-1626

BAXTER HEALTHCARE CORPORATION,

       *Defendant-Appellee.*

>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-71201—John Feikens, District Judge.

Argued: March 12, 2008

Decided and Filed: July 3, 2008

Before: KEITH, CLAY, and GILMAN, Circuit Judges.

---

### COUNSEL

**ARGUED:** Chrisdon F. Rossi, LAW OFFICES OF GARY ROSSI, Bloomfield Hills, Michigan, for Appellant. Noah A. Finkel, SEYFARTH SHAW, Chicago, Illinois, for Appellee. **ON BRIEF:** Gary A. Rossi, LAW OFFICES OF GARY ROSSI, Bloomfield Hills, Michigan, for Appellant. Noah A. Finkel, SEYFARTH SHAW, Chicago, Illinois, for Appellee.

CLAY, J., delivered the opinion of the court, in which KEITH, J., joined. GILMAN, J. (pp. 21-25), delivered a separate opinion concurring in part and dissenting in part.

---

### OPINION

---

CLAY, Circuit Judge. Plaintiff, Todd A. White ("White"), an African-American, appeals the district court's grant of summary judgment in favor of Defendant, Baxter Healthcare Corporation ("Baxter"), on White's employment discrimination claims brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (2000), Section 101 of the Civil Rights Act of 1991, 42 U.S.C. § 1981 (2000), and Michigan's Elliot-Larsen Civil Rights Act (the "Elliot-Larsen Act"), Mich. Comp. Laws § 37.2101 *et seq.* (2002). In particular, White contends that he has presented sufficient evidence for a jury to conclude that he was discriminated against on the basis of his race when Baxter (1) failed to promote him, and (2) downgraded his 2004 performance evaluation. We agree, and, for the reasons that follow, we **REVERSE** the district court's grant of Baxter's motion for summary judgment and **REMAND** the case for trial.

1

# I. BACKGROUND

Baxter, a subsidiary of Baxter International, Inc., produces and sells medical technologies related to the blood and circulatory systems. In April of 1998, Baxter purchased White's former employer, Ohmeda Pharmaceutical Products, Inc. ("Ohmeda"), and merged it into Baxter's Anesthesia, Critical Care, and Oncology ("ACCO") division. Since then, White has been a sales representative at Baxter, selling proprietary and generic pharmaceutical products to anesthesia professionals.[1] In January of 2001, White was promoted to the position of Teaching Center Specialist ("TCS"), a specialized sales representative who sells products to larger hospitals that run teaching programs and who is held to a higher standard of product knowledge and teaching skills.

During his first six years at Baxter, White was primarily supervised by Baxter Regional Manager Richard Clark ("Clark"), who also served as White's supervisor at Ohmeda prior to its merger with Baxter. White has not alleged, and the record does not reflect, that Clark harbors any discriminatory animus toward African-Americans. Beginning January 1, 2004, White was required to report to Tim Phillips ("Phillips"), Baxter Regional Manager of Northern Teaching Center Specialists, as his primary supervisor. Clark and Phillips, in turn, reported to Carl Gold ("Gold"), the ACCO Area Vice President for Sales for the eastern half of the United States.

Soon after Phillips became his supervisor, White began to notice signs of a discriminatory animus toward African-Americans on the part of Phillips. For example, according to White, when he complained to Phillips about scheduling a work meeting on the Martin Luther King, Jr. holiday, Phillips responded by telling White that "nobody wants to be around a black man." J.A. at 106. Phillips had allegedly made a similar comment – "no one wants to work with a black man" – when talking about workforce diversity with another Baxter employee, Jacinta Toland, on a previous occasion. J.A. at 633. White also noted that, during one of their conversations, Phillips had referred to an African-American sales representative as "that black girl," rather than referring to her by her name, Tanisha Gabriel, or by her position title. Likewise, Phillips would occasionally answer White's calls in jest by saying "White, Todd" instead of calling White by just his first name as he would with other employees. Finally, White was disturbed when Phillips circulated an e-mail to Baxter employees which showed an image of Osama Bin Laden morphing into O.J. Simpson and which contained the subject line "I KNEW IT!!! I KNEW IT!!! I KNEW IT!!!"

In contrast to the racially discriminatory comments White heard from Phillips, his experience at Baxter prior to being supervised by Phillips was one in which he generally received positive recognition for his outstanding sales performance. In 2000, White was awarded membership in Baxter's Distinguished Sales Club ("DSC") which is reserved for the top five percent of Baxter sales representatives in the country. Likewise, in 2001, White was placed in a TCS position, the highest sales position within Baxter. Finally, in 2003, White received a Sales Achievement Award and won a company-paid trip for being within the top twenty percent of sales representatives in the country. White was rated as "Meeting Expectations" in the years 2001 and 2002, and achieved the higher "Exceeding Expectations" rating in 2000 and 2003.[2]

---

[1] At oral argument, White's counsel indicated that after the district court's ruling was issued in this case, Baxter terminated White's employment. The stated reasons for this termination do not appear in the record and were not explained by counsel at oral argument. However, it is sufficient to note that at all times relevant for this appeal, White was employed by Baxter.

[2] White's performance in the 2003 fiscal year was so strong that Clark, his supervisor at the time, wrote the following in White's November 25, 2003 field report:

> Todd I could not be happier with your results YTD. You currently rank #2 on the contest YTD within the Teaching Center Specialists. That is terrific. I know that you will finish the year at #1!!! You are well on your way to winning a trip once again! You are also on your way of [sic] becoming another

Hoping to use his strong sales background to help Baxter's ACCO division perform even better, White applied for the position of ACCO Midwest Regional Manager in September of 2004. This was White's first, and only, application for a Regional Manager position at Baxter. Baxter had never previously hired any African-American managers (either regional or higher-ranked supervisors) within its ACCO division.

Gold was responsible for making the final hiring decision for the Regional Manager position. He enlisted Daryl Martin ("Martin"), Baxter Human Resources Director, and Carl Kunz ("Kunz"), ACCO Vice President for Sales for the western half of the United States, to assist him. Phillips was not formally involved in the Regional Manager selection process. However, according to Phillips, he encouraged White to apply for the position and told Gold that White would be "a good fit" for the job. J.A. at 175. Phillips also testified that he talked to Kunz about White's application, but his testimony does not indicate what was said during the conversation. Gold confirms that he spoke with Phillips about White. Yet, according to Gold, although Phillips had presented White as a potential management candidate in an internal development process called the Organized Talent Review ("OTR"), Phillips had "never really discussed the fact that [White] could move into a manager role." J.A. at 638.

As part of their selection process for the Regional Manager position, Gold, Martin, and Kunz interviewed White and four other candidates: Stacy Hord, Brett Corrick, Carey Redd, and Maggie Freed ("Freed"). White was the only African-American and the only applicant with a masters degree.[3] Freed, on the other hand, was the only woman interviewed for the position, and the only applicant who had not previously been a Baxter sales representative. In addition to interviewing the candidates, Gold, Martin, and Kunz also reviewed their resumes and prior performance evaluations and spoke to their regional managers. After the interviews were complete, Gold, Martin, and Kunz each ranked the candidates on their own before proceeding to a group discussion of them. All three interviewers ranked White last among the applicants. By contrast, the interviewers all ranked Freed as the top candidate. Freed was subsequently promoted to the Regional Manager position.

In their depositions, Gold, Martin, and Kunz explained their reasons for ranking White and Freed in the manner that they did. While each interviewer described Freed as enthusiastic, well-prepared, and ready for management, none of them expressed a concern that Freed was the only candidate lacking experience as a Baxter sales representative. Kunz noted that Freed had some prior experience in hiring, training, and managing people. Gold likewise found Freed to be "a person who's extremely energetic, talking about the business in a positive way, talking about the company in a positive way, the great cheerleader for her people." J.A. at 641. Gold also noted that Freed "had done some homework" and "knew the personnel in that central north – central Midwest region." *Id.* Finally, Gold indicated that he had been impressed by the fact that Freed "had a plan in place to try to move the business forward right out of the gate" with specific goals of where she needed to go in the next thirty, sixty, and ninety days. *Id.* Neither Gold, Martin, nor Kunz commented on Freed's lack of sales experience.

In contrast to Freed, the interviewers viewed White as "extremely aggressive." J.A. at 354. They also expressed concerns about his alleged lack of management experience. They observed that, in his evaluations, White "was not referred to as a team player." J.A. at 638. They further claimed that White interviewed poorly, purportedly coming across as "confrontational" and not

DSC winner.

J.A. at 627.

[3]White earned a Masters in Business Administration ("MBA") from Central Michigan University in April of 1994.

focused on the bigger picture of how to "turn the region around" and "move the business forward." J.A. at 640. In particular, Gold noted that White had asked him "what have I [Gold] done to promote cultural diversity within the company," and explained that "I would have rather him told me what he was going to do, you know, what his plan was – plan of action, where he thought this business was going to do [sic], what he thought he would do in the region to change things because he knew the situation." J.A. at 354.

In late September of 2004, White was informed that he had not received the Regional Manager position. A few months later, White received more bad news in the form of his 2004 performance evaluation.

As a Baxter employee, White was subject to both mid-year and year-end performance reviews. In these reviews, Baxter employees are evaluated in terms of "performance management objectives" ("PMO") and "success factors." Prior to 2004, the ACCO division issued only three types of ratings for its sales representatives: "Exceeds Expectations," "Meets Expectations," or "Does Not Meet Expectations." A representative rated as "Does Not Meet" generally could not receive a pay raise. In 2004, ACCO created, for the first time, the categories of "Meets Plus" and "Meets Minus." The creation of this latter category was designed to permit a sales representative who did not meet his or her sales goals to avoid a "Does Not Meet" rating, and thus still receive a pay raise, albeit a smaller one than would be available for achieving the "Meets," "Meets Plus," or "Exceeds" ratings. The parties dispute the manner in which Baxter company policy dictated how these 2004 ACCO ratings should have been determined.

According to White, a TCS's performance each year was to be evaluated pursuant to the relevant PMO Grid. This PMO Grid is a matrix which includes a list of all products sold by the ACCO division as well as the national averages of sales representatives' sales numbers for each of those products. The grid further specifies which percentage of sales for each product correlates to an "Exceeds," "Meets Plus," "Meets," "Meets Minus," or "Does Not Meet" rating. The 2004 PMO Grid, which was issued in November of 2004, set forth the following standards for evaluating an individual TCS's performance:

> **Exceeds** = Achievement of Suprane 100% plus 2 other categories meeting 100%. Some activity in PSA is necessary.
>
> **Meets** + = 100% in 3 of 4 categories
>
> **Meets** = 100% in 2 of 4 categories {one must be Suprane or Brevibloc}
>
> **Meets -** = 100% in 2 of 4 categories
>
> **Does not meet** = anything less

J.A. at 672. The 2004 PMO Grid also specified that "merit raise payouts" would be awarded on the following percentage basis:

| | |
|---|---|
| Exceeds | 5% |
| Meets + | 4% |
| Meets | 3% |
| Meets - | 2% or less |
| Does not meet | 0 |

J.A. at 673. White claims that his 2004 performance should have been evaluated according to these standards.

Baxter, however, suggests that in addition to considering the 2004 PMO Grid, regional managers were required to consider the directions given by Gold in an e-mail (the "Gold E-Mail") sent on October 22, 2004. This e-mail was directed to all Baxter Regional Managers, including Phillips, and stated:

> After careful review of the Suprane numbers and percent to plan the following reps leave a lot to be desired regarding their Suprane sales number this year. The six reps combined are 89% to plan with Suprane through August 2004. In addition four of the reps are down for the month off their YTD number. Needless to say, this is not a good situation. . . . Our Area cannot afford to keep individuals in a territory who cannot get close to plan on our #1 detailed product. The reps are as follows:
>
> * * *
>
> Todd White
>
> * * *
>
> Our Area is 99% to plan as a team. As a group these reps are 10 percentage points below that and are killing our Suprane numbers. If these reps cannot bring their numbers up to a minimum of 95% to plan by years [sic] end than [sic] they will receive a DOES NOT MEET on their PMO, receive a "0" and be placed on a PIP [Performance Improvement Plan].

J.A. at 657.

During 2004, White sold four Baxter proprietary products: Suprane, an inhalation agent used for general anesthesia; Brevibloc, a beta-blocker used to help control a patient's heart rate; the Transdermal Delivery System ("TDS"), a drug delivery vehicle which enables rapid absorption of drugs; and the Patient State Analyzer ("PSA"), a device which assesses the response of patients during the admission of anesthesia. White's year-end sales numbers were as follows: Suprane, 92%; Brevibloc, 105%; TDS, 101%; and PSA, unknown. Based on his performance, White claims that he was entitled to a "Meets" evaluation under the 2004 PMO Grid. However, Phillips, as White's supervisor for the 2004 fiscal year, was responsible for evaluating his annual performance. In his year-end performance evaluation of White, which was completed in early 2005, Phillips issued White an overall rating of "Meets Minus" and offered the following explanation:

> Based on Todd's quantitative results, Todd has achieved a rating of "Does Not Meet". However, due to Todd''s [sic] diligence and commitment to the business that has been demonstrated by his focus on Suprane and his consistent work in the Region, I have moved this rating to a Meets(-). This has been a tough and challenging year for Todd White. Todd has had to fight for everything he achieved this year. It is my expectation that Todd will turn his business around in 2005. In 2005, I will expect that all special Marketing programs will be utilized in the designated time frame. In addition, at Mid-year 2005, I will expect that Todd is achieving budget in 2 of 4 categories, one of them being Suprane. Otherwise further corrective action may be needed. Todd has overachieved in the past so I know he is capable with a dedication of more focus on his Baxter ACC franchise.

J.A. at 670. As a result of this "Meets Minus" evaluation, White did receive a pay raise in 2004. This salary increase was not as high as it would have been if White had received a "Meets" evaluation.

Shortly after receiving his 2004 performance evaluation, White filed a complaint with the Equal Employment Opportunity Commission ("EEOC").  On February 3, 2005, the EEOC issued White a Right-To-Sue letter.  White then filed the present action against Baxter in the United States District Court for the Eastern District of Michigan, alleging that Baxter had discriminated against him on the basis of his race in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, Section 101 of the Civil Rights Act of 1991, 42 U.S.C. § 1981, and Michigan's Elliot-Larsen Act, Mich. Comp. Laws § 37.2101 *et seq.*  In particular, White alleged that Baxter had discriminated against him by: (1) failing to promote him to a number of different positions, including the ACCO Midwest Regional Manager position; (2) denying him company benefits such as an interviewing skills class and stock options; and (3) downgrading his 2004 performance review.  In his complaint, White also stated a claim of gender discrimination pursuant to Title VII and the Elliot-Larsen Act.

On March 31, 2006, Baxter filed a motion for summary judgment on all of White's claims. The district court then referred the case to a magistrate judge, who recommended that Baxter's motion be granted in its entirety.  White filed objections to the magistrate judge's report and recommendations.  However, on April 16, 2007, after conducting a *de novo* review of the record in light of White's objections, the district court adopted the magistrate judge's report and recommendations in full, granted Baxter's motion for summary judgment, and dismissed the case. *See White v. Baxter Healthcare Corp.*, No. 05-71201, 2007 WL 1119881 (E.D. Mich. Apr. 16, 2007).

On May 14, 2007, White filed this timely appeal.  On appeal, White has abandoned his gender discrimination claim.  He has likewise limited his race discrimination claim to challenging (1) Baxter's failure to promote him to the ACCO Midwest Regional Manager Position, and (2) his "Meets Minus" 2004 performance review.

## II.  STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*.  *Mutchler v. Dunlap Memorial Hospital*, 485 F.3d 854, 857 (6th Cir. 2007).  Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Arizona v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record which demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its initial burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.  When the moving party has carried forward this burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  The non-moving party may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. *Id.*; *accord* Fed. R. Civ. P. 56(e)(2).

After the parties have presented the evidence, "the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  In evaluating the evidence, the court must draw all inferences

in the light most favorable to the non-moving party. *Matsushita,* 475 U.S. at 587. However, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the" non-moving party. *Anderson*, 477 U.S. at 252.

## III. DISCUSSION

White challenges the district court's dismissal of two distinct race discrimination claims. First, White disputes the grant of summary judgment to Baxter on his claim that Baxter failed to promote him to the ACCO Midwest Regional Manager position on account of his race. Second, White contests the district court's conclusion that he has produced insufficient evidence to show that his race was a motivating factor in Phillips' decision to downgrade his 2004 performance evaluation. We consider each of these arguments in turn.

### A.     Failure to Promote Claim

White first alleges that Baxter violated Title VII by failing to promote him on account of his race. White brings this challenge pursuant to Title VII's general anti-discrimination provision, 42 U.S.C. § 2000e-2(a)(1),[4] 42 U.S.C. § 1981, and Michigan's Elliot-Larsen Act. Title VII's anti-discrimination provision makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Similarly, § 1981 guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981. Likewise, § 202 of the Elliot-Larsen Act provides that "[a]n employer shall not . . . [f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment compensation, or a term, condition or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status." Mich. Comp. Laws § 37.2202(1)(a).

Absent direct evidence of discrimination,[5] claims brought pursuant to Title VII's anti-discrimination provision, § 1981, and the Elliot-Larsen Act are subject to the tripartite burden-shifting framework first announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and subsequently modified in *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248 (1981). *See, e.g., Lindsay v. Yates*, 498 F.3d 434, 440 n.7 (6th Cir. 2007) ("The *McDonnell Douglas / Burdine* framework applies only when discrimination plaintiffs rely on circumstantial evidence to prove their claims."); *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) ("We

---

[4]White has presented his failure to promote claim as a single-motive discrimination claim brought pursuant only to 42 U.S.C. § 2000e-2(a)(1). Thus, we do not analyze his claim under the unique mixed-motive summary judgment analysis that is appropriate for claims brought pursuant to 42 U.S.C. § 2000e-2(m). *See infra* section III.B.

[5]In general, a Title VII plaintiff may establish a case of unlawful discrimination through either direct or circumstantial evidence. We have explained the difference between these two types of evidence as follows:

> Direct evidence of discrimination is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred. *Kline* [*v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997)].

*Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc).

review claims of alleged race discrimination brought under § 1981 and the Elliot-Larsen Act under the same standards as claims of race discrimination brought under Title VII."). Under this framework, the plaintiff bears the initial "not onerous" burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *Burdine*, 450 U.S. at 253. To establish a *prima facie* case of employment discrimination, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008); *accord Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007); *see also Lind v. City of Battle Creek*, 681 N.W.2d 334, 338 (Mich. 2004) (confirming that the *McDonnell Douglas* test for a *prima facie* case applies to claims brought pursuant to the Elliot-Larsen Act); *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 521 (Mich. 2001) (same); *Lytle v. Malady*, 579 N.W.2d 906, 914 & n.19 (Mich. 1998) (describing the fourth part of the *prima facie* case as requiring the plaintiff to show that he "was discharged under circumstances that give rise to an inference of unlawful discrimination," but explaining that "[t]his four part test is an adaptation of the United States Supreme Court's *McDonnell Douglas* test to prove a prima facie case of discrimination"). Once the plaintiff establishes this *prima facie* case, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Burdine*, 450 U.S. at 253; *McDonnell Douglas*, 411 U.S. at 802. Finally, if the defendant succeeds in this task, the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination. *Burdine*, 450 U.S. at 253; *see Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994) ("[O]nce the employer has come forward with a nondiscriminatory reason for [its actions] the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation."). Although the burdens of production shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *See Burdine*, 450 U.S. at 256.

In the instant case, Baxter has conceded that White has established a *prima facie* case of race discrimination. *See White*, 2007 WL 1119881, at *14 ("The parties appear to agree that Plaintiff is able to satisfy his *prima facie* case."); J.A. at 81-82 (Defendant Baxter Healthcare Corporation's Memorandum of Law on Its Motion for Summary Judgment) (failing to argue that White has not established his *prima facie* case and instead arguing that White cannot demonstrate pretext); Def. Br. at 22-24 (same). In response, however, Baxter offers an allegedly non-discriminatory reason for its promotion of Freed instead of White to the ACCO Midwest Regional Manager position:

> Baxter selected Freed instead of White because, as Sales Training Manager, Freed had managed direct reports, had dotted-line managerial experience with respect to a very large group of field sales trainers, and performed a large amount of training; she had worked in human resources and performed management and leadership training; she was well-prepared for the interview with specific objectives for turning around the region, and was enthusiastic and demonstrated confidence and a high energy level during her interview. Indeed, as Sales Training Manager, Freed hired, trained, and managed the sales training efforts of 14 to 16 national field trainers for both pharmaceuticals and devices, managed two direct reports, and had developed and implemented training programs. During the course of her employment, she won three trips for sales, and was rated "exceeds expectations" for several years. White lacked this managerial experience and did not interview well: in the view of the interviewers, he was "in-your-face" aggressive, demonstrated an inflexible management style, and did not present a persuasive plan for turning around the region.

Def. Br. at 22-23 (citations to record omitted).

We consider this proffered explanation for the failure to promote White to be facially legitimate and non-discriminatory. Baxter's alleged reason for its promotion decision is "clear and reasonably specific," *Burdine*, 450 U.S. at 258, and is arguably supported by "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision [was] not motivated by discriminatory animus," *id*. at 257. Thus, we turn to the final part of the *McDonnell Douglas / Burdine* analysis: White's showing of pretext. Baxter contends, and the district court found, that White has failed to produce sufficient evidence to convince a jury that Baxter's explanation of its reason for not promoting White was merely prextextual. We disagree.

Pretext may be established "either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action. *See Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008) (citing *Manzer*, 29 F.3d at 1084). However, the plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision "to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation."[6] *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 578 (6th Cir. 2003) (en banc); *see also Burdine*, 450 U.S. at 259 ("The fact that a court may think that the employer misjudged the qualifications of applicants does not in itself expose him to Title VII liability, *although this may be probative of whether the employer's reasons are pretexts for discrimination*." (emphasis added)); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n.6 (1st Cir. 1979) ("The reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose as a pretext, if indeed it is one."). As the D.C. Circuit has aptly observed:

---

[6]Contrary to what Judge Gilman maintains, our Circuit has never adopted a "business-judgment rule" which requires us to defer to the employer's "reasonable business judgment" in Title VII cases. Dissenting Op. at 23-24. Indeed, in most Title VII cases the very issue in dispute is whether the employer's adverse employment decision resulted from an objectively unreasonable business judgment, *i.e.*, a judgment that was based upon an impermissible consideration such as the adversely-affected employee's race, gender, religion, or national origin. In determining whether the plaintiff has produced enough evidence to cast doubt upon the employer's explanation for its decision, we cannot, as Judge Gilman does, unquestionably accept the employer's own self-serving claim that the decision resulted from an exercise of "reasonable business judgment." Dissenting Op. at 24. Nor can we decide "as a matter of law" that "an employer's proffered justification is reasonable." Dissenting Op. at 24. The question of whether the employer's judgment was reasonable or was instead motivated by improper considerations is for the *jury* to consider. Our role is merely to assess whether the plaintiff has presented enough evidence for a reasonable jury to accept the plaintiff's claim that the employer made an unlawful business decision. *See Anderson*, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

One way in which the plaintiff may raise doubts about the lawfulness of the employer's business decision is by suggesting that the decision itself was unreasonable. Thus, in *Smith v. Chrysler Corp.*, we expressly found that an employee may demonstrate that the employer's proffered explanation for its decision is a mere pretext for discrimination by showing that "the employer failed to make a reasonably informed and considered business decision, thereby making its decisional process 'unworthy of credence.'" 155 F.3d 799, 807-808 (6th Cir. 1998). Likewise, in *Wexler*, we confirmed that "the reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." 317 F.3d at 578. Inasmuch as Judge Gilman reads this precedent as creating an employer-deferent "business-judgment rule," it is he, not us, who is misconstruing the law. Dissenting Op. at 23.

> If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate – something employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture.

*Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998).

In the instant case, we find that White has produced enough evidence for a reasonable jury to infer that Baxter's proffered explanation for its hiring decision may be merely a pretext for unlawful discrimination. In particular, we find that the evidence presented could lead a jury to doubt the reasonableness of Baxter's decision to hire Freed instead of White, and thereby to infer that some other impermissible motivation – such as White's race – guided the employment decision.

The record undisputedly demonstrates that White possessed some qualifications for managerial work which Freed did not. For example, White was the only applicant for the ACCO Regional Manger position who had gone to graduate school to earn an MBA. Likewise, in stark contrast to Freed, White had several years of experience as an ACCO sales representative and TCS. During these years, White was consistently rated as a high performer and had the opportunity to become very familiar with all of the products sold by the division as well as the challenges faced in selling such products. Finally, White had significant prior sales management experience from a job at Johnson & Johnson, Inc. ("Johnson & Johnson") where he "[m]anaged five sales representatives . . . [p]articipated in initial sales training, conducted district meetings, and [was] responsible for recruitment and interviewing." J.A. at 505.

We find that this evidence of White's arguably superior qualifications for the ACCO regional manager position, in and of itself, could lead a jury to doubt the justifications given for Baxter's hiring decision. At minimum, White has created a genuine issue of material fact concerning the reasonableness of Baxter's decision. Indeed, Baxter itself concedes that "White certainly had several positive aspects to his candidacy, and [that] Freed would have presented an even stronger candidacy if she had experience selling Baxter pharmaceutical products." Def. Br. at 24 n.11. Nevertheless, Baxter argues that it was appropriate for all three interviewers to rank White last among the candidates, and thus eventually deny him the promotion, because of his allegedly poor performance during the interview and because of Freed's allegedly more extensive managerial experience.

Yet, viewing the record in the light most favorable to White, as we must,[7] we find that a jury could reasonably disbelieve both of these proffered explanations. First, any evaluation of White's interview performance is an inherently subjective determination, and thus easily susceptible to manipulation in order to mask the interviewer's true reasons for making the promotion decision. Indeed, since the very issue in dispute is whether the reasons given by these interviewers for their decision should be believed, it would be highly inappropriate for us to assume, as Judge Gilman does, that their own subjective perceptions of White were accurate. Moreover, we find Gold, Martin, and Kunz's statements indicating that White came across as aggressive and lacking in management vision to be self-serving and conclusory. The only factually based explanation of why White might have appeared aggressive to the interviewers comes from Gold, who recounts how he

---

[7]Unlike Judge Gilman, whose analysis seeks to minimize White's objective qualifications for the Regional Manager position while bolstering the subjective views of the Baxter decision-makers, *see* Dissenting Op. at 22-23, we do not waste judicial resources in crafting a reading of the evidence that is most favorable to the defendant-employer and most hostile to the plaintiff-employee. Rather, we follow the Supreme Court's command to view "the inferences to be drawn from the underlying facts . . . in the light most favorable to the party opposing the motion" for summary judgment. *Matsushita*, 475 U.S. at 587 (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

was disturbed by White's questions about Baxter's lack of workforce diversity, particularly within its management positions. However, in light of White's overall claim that he was discriminated against on the basis of his race, we believe that a reasonable juror could find suspect White's interviewers' perception of such a question as "aggressive."

Second, Baxter's claim that Freed possessed significantly more experience than White appears overblown. Again, it is notable that Freed had no prior experience as a Baxter sales representative and, in all likelihood, was less familiar than was White with the specific challenges faced by the ACCO division in promoting Baxter's products. While the record does reflect that Freed had some prior management experience in Baxter's Medication Delivery division, the record does not support Baxter's self-serving contention that this management experience was significantly more extensive than White's own prior sales management experience at Johnson & Johnson. Moreover, during her interview, Freed admitted that she had previously found it difficult to confront subordinates while in a managerial role. In particular, Freed described an incident in which she feared confronting a Baxter employee about his chronic tardiness. We find that a juror considering such evidence could reasonably conclude that Baxter's claim that Freed was more qualified than White for the ACCO Regional Manager position is not based in fact.

In sum, we find that White has offered sufficient evidence to suggest that Baxter's purported reason for not promoting him – namely, Freed's better qualifications for the Regional Manager position – has no basis in fact, did not actually motivate Baxter's decision, or is not sufficient to explain its hiring choice. *See Imwalle*, 515 F3d at 545. Accordingly, we hold that White has met his *McDonnell Douglas / Burdine* burden of producing enough evidence to convince a reasonable jury that Baxter's proffered reasons for not promoting him may have been a mere pretext for racial discrimination, and thus, Baxter is not entitled to summary judgment on White's failure to promote claim.

## B.     Downgraded Performance Evaluation Claim

In his second claim, White alleges that Baxter violated Title VII by intentionally downgrading his 2004 performance evaluation because White is an African-American. In particular, White claims that Phillips' decision to give him a "Meets Minus" rating, as opposed to the "Meets" rating to which White claims he was entitled, was motivated, at least in part, by White's race. In other words, White challenges his allegedly downgraded performance evaluation under a mixed-motive theory pursuant to 42 U.S.C. § 2000e-2(m). This section of Title VII permits a plaintiff to show that the defendant has engaged in an unlawful employment practice by "demonstrat[ing] that race, color, religion, sex, or national origin was a motivating factor for [the] employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

White supports his mixed-motive claim with circumstantial, rather than direct, evidence. Our Circuit, however, has not yet determined the proper summary judgment framework to apply to a Title VII mixed-motive claim supported by circumstantial evidence.[8] *See Tysinger v. Police Dept. of City of Zanesville*, 463 F.3d 569, 578 (6th Cir. 2006) (refusing to decide "whether the evidence

---

[8] In the case of a mixed-motive claim supported by direct evidence of discrimination, the summary judgment analysis is rather simple. To survive a defendant's summary judgment motion, the plaintiff must have produced "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'" *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003) (quoting 42 U.S.C. § 2000e-2(m)). However, in the case of a mixed-motive claim supported by circumstantial evidence of an employer's discriminatory motive, the question arises whether we should apply the *McDonnell Douglas / Burdine* burden-shifting framework which we use to analyze single-motive Title VII claims supported by circumstantial evidence. *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 712 (6th Cir. 2006) ("[N]ow that such mixed-motive claims can be brought based on circumstantial evidence, the question arises as to the effect of *Desert Palace* on the analysis of mixed-motive claims at the summary judgment stage.").

[in a Title VII mixed-motive case] is evaluated in terms of *prima facie* case elements, pretext requirements, or a mixed-motive analysis apart from the *McDonnell Douglas* framework" because "[u]nder any of these constructs, [the plaintiff]'s evidence clearly falls short of creating a genuine issue of material fact"); *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 713 n.4 (6th Cir. 2006) ("Because . . . the facts of the instant case do not require resolution of the question, we refrain today from announcing a new or modified framework for evaluation of mixed-motive claims at the summary judgment stage."). Accordingly, we must begin our discussion of White's downgraded performance evaluation claim with a consideration of the appropriate summary judgment framework to apply to mixed-motive claims brought pursuant to 42 U.S.C. § 2000e-2(m).

### 1.     Summary Judgment Framework for Title VII Mixed-Motive Claims

Since 1964, Title VII has made it an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Discrimination claims brought pursuant to this section are traditionally categorized as either single-motive claims, *i.e.*, where an illegitimate reason motivated an employment decision, or mixed-motive claims, *i.e.*, where both legitimate and illegitimate reasons motivated the employer's decision. *Wright*, 455 F.3d at 711. This distinction was first recognized by the Supreme Court in *Price Waterhouse v. Hopkins*, when it considered the issue of whether an employment decision is made "because of" a protected characteristic in a "mixed-motive" case. 490 U.S. 228, 240 (1989). A divided Court found that, while Title VII prohibits an employer from taking a protected characteristic into account at all when making an employment decision, an employer could avoid liability under the statute by demonstrating that it would have made the same employment decision even if it had not taken into account the protected characteristic. *See id.* at 242 (plurality opinion).

In response to the *Price Waterhouse* decision and other Title VII decisions, Congress passed the Civil Rights Act of 1991. *See Landgraf v. USI Film Products*, 511 U.S. 244, 250 (1994). Among other things, section 107 of this act created an alternative method of demonstrating an unlawful employment practice:

> Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

42 U.S.C. § 2000e-2(m). The purpose and effect of this section was "to eliminate the employer's ability to escape liability in Title VII mixed-motive cases by proving that it would have made the same decision in the absence of the discriminatory motivation." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc); *accord Wright*, 455 F.3d at 711. Under the statute, such proof only enables the employer to limit the remedies available to the plaintiff-employee for the Title VII violation. *See* 42 U.S.C. § 2000e-5(g)(2)(B) (prohibiting damages awards and allowing only the grant of declaratory relief, injunctive relief, and attorney's fees when the defendant-employer proves that it would have taken the same action in the absence of the impermissible motivating factor).

For the first decade after the enactment of 42 U.S.C. § 2000e-2(m), many federal courts required a Title VII plaintiff asserting a mixed-motive claim under this section to produce direct, as opposed to circumstantial, evidence that consideration of a protected characteristic was a motivating factor in the challenged employment decision. *See, e.g.*, *Wexler*, 317 F.3d at 571 ("Under this mixed-motive analysis, the plaintiff must produce *direct* evidence that the employer considered

impermissible factors when it made the adverse employment decision at issue." (emphasis added) (citing *Price Waterhouse*, 490 U.S. at 244-46)); *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) ("A plaintiff qualifies for the more advantageous standard of liability applicable in mixed-motive cases if the plaintiff presents 'direct evidence that decision makers placed substantial negative reliance on an illegitimate criterion.'" (citation omitted)). As mixed-motive plaintiffs were not allowed to demonstrate their claims through circumstantial evidence, these courts did not even consider whether such plaintiffs should be required to satisfy the *McDonnell Douglas / Burdine* burden shifting framework in order to reach a jury.[9] *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."); *Wright*, 455 F.3d at 716 (Moore, J., concurring) ("Our pre-*Desert Palace* view that direct evidence was required to establish a mixed-motive case, kept mixed-motive claims distinct from claims analyzed under the *McDonnell Douglas* framework, which was applied when the plaintiff relied on circumstantial evidence.").

In *Desert Place, Inc. v. Costa*, the Supreme Court altered this practice by finding that a plaintiff may prove a Title VII mixed-motive case by either direct or circumstantial evidence. 539 U.S. 90, 92 (2003). Relying on the plain text of 42 U.S.C. § 2000e-2(m), the Court held that in order to obtain a mixed-motive jury instruction, "a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'" *Id*. at 101 (quoting 42 U.S.C. § 2000e-2(m)). However, as the issue in *Desert Palace* concerned a jury-instruction challenge, the Court did not consider whether the *McDonnell Douglas / Burdine* burden-shifting framework should apply to the pretrial summary judgment analysis of mixed-motive discrimination claims based on circumstantial evidence in the same way that it applies to single-motive discrimination claims based on circumstantial evidence. *See Tysinger*, 463 F.3d at 577; *Suits v. Heil*, 192 F. App'x 399, 408 (6th Cir. 2006) (unpublished).

Since *Desert Palace*, the federal courts of appeals have, without much, if any, consideration of the issue, developed widely differing approaches to the question of how to analyze summary judgment challenges in Title VII mixed-motive cases. *See generally Wright*, 455 F.3d at 716-19 (Moore, J., concurring) (discussing and evaluating the responses of our sister circuits to the Supreme Court's decision in *Desert Palace*). The Eighth Circuit has explicitly held that the *McDonnell Douglas / Burdine* burden-shifting framework applies to the summary judgment analysis of mixed-motive claims after *Desert Palace*. *See Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) ("[W]e conclude that *Desert Palace* had *no* impact on prior Eighth Circuit summary judgment decisions."). The Eleventh Circuit seems to have joined the Eighth Circuit in this regard. *See Burnstein v. Emtel, Inc.*, 137 F. App'x 205, 209 n.8 (11th Cir. 2005) (unpublished) (suggesting that the *McDonnell Douglas* analysis continues to apply in mixed-motive cases without modification post-*Desert Palace*); *Cooper v. Southern Co.*, 390 F.3d 695, 725 n.17 (11th Cir. 2004) (rejecting an argument that "the *McDonnell Douglas* burden-shifting analysis . . . was radically revised by the

---

[9]As already noted, *see supra* section III.A, under the *McDonnell Douglas / Burdine* framework, a Title VII plaintiff seeking to prove a claim of single-motive discrimination by means of circumstantial evidence must survive a series of shifting burdens of production:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine*, 450 U.S. at 252. In order to survive a defendant's motion for summary judgment, the single-motive Title VII plaintiff must produce sufficient evidence to overcome these burdens of production.

Supreme Court in *Desert Palace*" and noting that "after *Desert Palace* was decided, this Court has continued to apply the *McDonnell Douglas* analysis in non-mixed-motive cases").

The Fifth Circuit, in contrast, has adopted a "modified *McDonnell Douglas*" approach, under which a plaintiff in a mixed-motive case can rebut the defendant's legitimate non-discriminatory reason not only through evidence of pretext (the traditional *McDonnell Douglas / Burdine* burden), but also with evidence that the defendant's proffered reason is only one of the reasons for its conduct (the mixed-motive alternative). *See Machinchick v. PB Power, Inc.*, 398 F.3d 345, 352 (5th Cir. 2005); *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).

Adopting a sort of middle ground between these two positions are the Fourth and Ninth Circuits which permit a mixed-motive plaintiff to avoid a defendant's motion for summary judgment by proceeding either under the "pretext framework" of the traditional *McDonnell Douglas / Burdine* analysis or by "presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated [, at least in part,] the adverse employment decision." *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005); *see Hill*, 354 F.3d at 284-85; *McGinset v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004) (finding that a mixed-motive plaintiff "may proceed using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated" the employment decision). The D.C. Circuit appears to have recently joined this middle ground approach. *See Fogg v. Gonzales*, 492 F.3d 447, 451 & n* (D.C. Cir. 2007) (indicating that "a plaintiff can establish an unlawful employment practice by showing that 'discrimination or retaliation played a "motivating part" or was a "substantial factor" in the employment decision'" but noting that a "plaintiff may also, of course, use evidence of pretext and the *McDonnell Douglas* framework to prove a mixed-motive case").

Failing to adopt any of these views, the First, Third, and Tenth Circuits have refrained from deciding whether the *McDonnell Douglas* framework applies to mixed-motive claims. *See Houser v. Carpenter Tech. Corp.*, 216 F. App'x 263, 265 (3d Cir. 2007) (unpublished) (refusing to decide the issue because the plaintiff had failed to produce sufficient evidence to survive summary judgment under any mixed-motive standard); *Furas v. Citadel Comm. Corp.*, 168 F. App'x 257, 260 (10th Cir. 2006) (unpublished) (refusing to decide the issue because the plaintiff failed to properly preserve the argument for appeal); *Rodriguez v. Sears Roebuck de Puerto Rico, Inc.*, 432 F.3d 379, 380-81 (1st Cir. 2005); *Hillstron v. Best Western TLC Hotel*, 354 F.3d 27, 31 (1st Cir. 2003). Finally, the Second and Seventh Circuits appear not to have even considered this issue.

Our Circuit, like the First, Third, and Tenth Circuits, has yet to resolve the question of the appropriate framework to apply to Title VII mixed-motive claims at the summary judgment stage despite having been presented with the issue in five (two published, three unpublished) prior cases. *See Tysinger*, 463 F.3d at 578 (finding it unnecessary to consider whether the *McDonnell Douglas* framework still applies in analyzing mixed-motive summary judgment challenges because the plaintiff's evidence failed to create a genuine issue of material fact on the question of whether discriminatory animus was a motivating factor in the employment decision); *Wright*, 455 F.3d at 712-13 (same); *Suits*, 192 F. App'x at 408 (finding that "whatever the import of *Desert Palace* . . . [m]ixed motive analysis cannot apply here because plaintiff has failed to come forward with evidence from which a trier of fact could find that discrimination was even partly a motivation for her termination"); *Aquino v. Honda of America, Inc.*, 158 F. App'x 667, 674-76 (6th Cir. 2005) (unpublished) (failing to address the impact of *Desert Palace* on Title VII claims, but holding that "*Desert Palace* does not modify *McDonnell Douglas* in employment discrimination lawsuits filed under § 1981"); *Harris v. Giant Eagle, Inc.*, 133 F. App'x 288, 297 (6th Cir. 2005) (unpublished) (finding it unnecessary to address "the question of whether the *McDonnell Douglas* burden-shifting framework should be modified in the wake of *Desert Palace*" because the plaintiff had not set forth

sufficient evidence from which a jury could reasonably infer that race was a motivating factor in the employment decision). *But see Wright*, 455 F.3d at 720-21 (Moore, J., concurring) (proposing that we resolve the issue by finding that the *McDonnell Douglas* framework does not apply to mixed-motive claims based on circumstantial evidence).

This case now presents us with the opportunity to finally clarify how Title VII mixed-motive claims should be analyzed at the summary judgment stage. We do so by holding that the *McDonnell Douglas / Burdine* burden-shifting framework does *not* apply to the summary judgment analysis of Title VII mixed-motive claims.[10] We likewise hold that to survive a defendant's motion for summary judgment, a Title VII plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) "race, color, religion, sex, or national origin was *a* motivating factor" for the defendant's adverse employment action. 42 U.S.C. § 2000e-2(m) (emphasis added). *See Wright*, 455 F.3d at 716 (Moore, J., concurring) ("[A]n employee raising a mixed-motive claim can defeat an employer's motion for summary judgment by presenting evidence – either direct or circumstantial – to 'demonstrate' that a protected characteristic 'was a *motivating factor* for an employment practice, even though other factors also motivated the practice.'" (quoting 42 U.S.C. § 2000e-2(m))). This burden of producing some evidence in support of a mixed-motive claim is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim. *See Anderson*, 477 U.S. at 252. Moreover, as it is irrelevant, for purposes of a summary judgment determination, whether the plaintiff has presented direct or circumstantial evidence in support of the mixed-motive claim, *see Desert Palace*, 539 U.S. at 99-100, we direct that this summary judgment analysis just described, rather than the *McDonnell Douglas / Burdine* burden-shifting framework, be applied in all Title VII mixed-motive cases regardless of the type of proof presented by the plaintiff.

Our refusal to extend the application of the *McDonnell Douglas / Burdine* framework to our summary judgment analysis of Title VII mixed-motive claims is based upon a careful consideration of the Supreme Court's opinions in those cases. In *Burdine*, the Court explained that the purpose of the "*McDonnell Douglas* division of intermediate evidentiary burdens" is "to bring litigants and the court expeditiously and fairly to [the] ultimate question" of whether the defendant intentionally discriminated against the plaintiff. *Burdine*, 450 U.S. at 253. In single-motive Title VII cases, the *McDonnell Douglas* shifting burdens of production effectively accomplish this task by "smok[ing] out the single, ultimate reason for the adverse employment decision." *Wright*, 455 F.3d at 720 (Moore, J, concurring). In particular, the *prima facie* case requirement "eliminates the most common nondiscriminatory reasons for" the adverse employment action, and thus creates a presumption that the adverse employment action was not motivated by legitimate reasons, but rather by a discriminatory animus. *Burdine*, 450 U.S. at 254. Likewise, the pretext requirement is designed to test whether the defendant's allegedly legitimate reason was the real motivation for its actions. *Id*. at 256. Such a narrowing of the actual reasons for the adverse employment action is necessary to determine whether there is sufficient evidence to proceed to trial in a single-motive discrimination case because the plaintiff in such a case must prove that the defendant's

---

[10]However, as is clear from section III.A of this opinion, the *McDonnell Douglas / Burdine* framework continues to guide our summary judgment analysis of single-motive discrimination claims brought pursuant only to Title VII's general anti-discrimination provision, 42 U.S.C. § 2000e-2(a)(1), and not pursuant to 42 U.S.C. § 2000e-2(m). We decline to adopt the view, proposed by some courts and commentators, that the *McDonnell Douglas / Burdine* framework has ceased to exist entirely following *Desert Palace. See, e.g., Dare v. Wal-Mart Stores, Inc.*, 267 F. Supp.2d 987 (D. Minn. 2003); Jeffrey A. Van Detta, *"Le Roi est Mort; Vive le Roi!": An Essay on the Quiet Demise of* McDonnell Douglas *and the Transformation of Every Title VII Case After* Desert Palace, Inc. v. Costa *Into a "Mixed-Motives" Case*, 52 DRAKE L. REV. 71 (2003); William R. Corbett, McDonnell Douglas*, 1973-2003: May You Rest In Peace?*, 6 U. PA. J. LAB. & EMP. L. 199 (2003). Indeed, post-*Desert Palace*, the Supreme Court has continued to apply the *McDonnell Douglas / Burdine* analysis to summary judgment challenges in single-motive Title VII cases. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 53-54 (2003).

discriminatory animus, and not some legitimate business concern, was the ultimate reason for the adverse employment action. *See id.*

However, this elimination of possible legitimate reasons for the defendant's action is not needed when assessing whether trial is warranted in the mixed-motive context. In mixed-motive cases, a plaintiff can win simply by showing that the defendant's consideration of a protected characteristic "was *a* motivating factor for any employment practice, *even though other factors also motivated the practice.*" 42 U.S.C. § 2000e-2(m) (emphasis added). In order to reach a jury, the plaintiff is not required to eliminate or rebut all the possible legitimate motivations of the defendant as long as the plaintiff can demonstrate that an illegitimate discriminatory animus factored into the defendant's decision to take the adverse employment action. As the shifting burdens of *McDonnell Douglas* and *Burdine* are unnecessary to assist a court in determining whether the plaintiff has produced sufficient evidence to convince a jury of the presence of at least one illegitimate motivation on the part of the defendant, we conclude that the *McDonnell Douglas / Burdine* framework does not apply to our summary judgment analysis of mixed-motive claims. The only question that a court need ask in determining whether the plaintiff is entitled to submit his claim to a jury in such cases is whether the plaintiff has presented "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for'" the defendant's adverse employment decision. *Desert Palace,* 539 U.S. at 101 (quoting 42 U.S.C. § 2000e-2(m)).

A Title VII plaintiff may certainly find parts of the *McDonnell Douglas / Burdine* framework to be useful in presenting a mixed-motive claim. As Judge Moore has aptly noted:

> Although the employee need not establish a *McDonnell Douglas* prima facie case to defeat a motion for summary judgment on a mixed-motive claim, setting forth a prima facie case of discrimination under *McDonnell Douglas* can aid the employee in showing that an illegitimate reason motivated the adverse employment decision. [Likewise, in] assessing whether an employee has demonstrated that an illegitimate reason was a motivating factor in the employer's adverse decision, the court should also consider evidence presented by the employer that the protected characteristic was *not* a motivating factor for its employment decision.

*Wright*, 455 F.3d at 720 (Moore, J., concurring). Nevertheless, we emphasize that compliance with the *McDonnell Douglas / Burdine* shifting burdens of production is *not* required in order to demonstrate that the defendant's adverse employment action was motivated in part by a consideration of the plaintiff's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(m). The ultimate question for the court in making a summary judgment determination in such a case is not whether the plaintiff has produced sufficient evidence to survive the *McDonnell Douglas / Burdine* shifting burdens, but rather whether there are any genuine issues of material fact concerning the defendant's motivation for its adverse employment decision, and, if none are present, whether the law – 42 U.S.C. § 2000e-2(m) – supports a judgment in favor of the moving party on the basis of the undisputed facts. *See* Fed. R. Civ. P. 56(c). As "[i]nquiries regarding what actually motivated an employer's decision are very fact intensive," such issues "will generally be difficult to determine at the summary judgment stage" and thus will typically require sending the case to the jury. *Wright*, 455 F.3d at 721 (Moore, J., concurring) (citing *Singfield v. Akron Metro Hous. Auth.*, 389 F.3d 555, 564 (6th Cir. 2004)).

## 2.     Application of the Mixed-Motive Summary Judgment Framework to White's Case

Having determined the appropriate pretrial legal framework to apply to mixed-motive Title VII cases, we now proceed to consider whether Baxter is entitled to summary judgment on White's

downgraded performance evaluation claim. To survive Baxter's motion for summary judgment, White must be able to point to evidence in the record on which a jury could reasonably conclude that (1) Baxter's took an adverse employment action against White, for which (2) White's race was a motivating factor. Reviewing the record in the light most favorable to White, we find that White is able to meet this minimal burden of production, and thus that Baxter is not entitled to summary judgment.

### a.     Adverse Employment Action

As indicated in the above framework, in order to present a claim, either mixed-motive or single-motive, under Title VII, a plaintiff must demonstrate that he has suffered an "adverse employment action." *See White v. Burlington Northern & Santa Fe Ry.*, 364 F.3d 789, 795 (6th Cir. 2004) (en banc), *aff'd in relevant part*, 126 S. Ct. 2405 (2006). An adverse employment action is an action by the employer that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries v. Ellerth*, 524 U.S. 742, 761 (1998). In general, "a negative performance evaluation does not constitute an adverse employment action unless the evaluation has an adverse impact on an employee's wages or salary." *Tuttle v. Metropolitan Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007); *see also Holt v. Morgan*, 79 F. App'x 139, 141 (6th Cir. 2003) (unpublished); *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir. 1999); *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999). Thus, to characterize a negative performance evaluation as an adverse employment action "the plaintiff must point to a tangible employment action that she alleges she suffered, or is in jeopardy of suffering, because of the downgraded evaluation." *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 789 (6th Cir. 2000).

In the instant case, we find that White's allegedly downgraded performance evaluation constitutes an adverse employment action. While the performance evaluation is not nearly as negative as White's characterization of it suggests, we find that there is sufficient evidence in the record for a jury to reasonably conclude that White has suffered negative employment consequences as a result of the performance evaluation. In particular, the record indicates that by receiving a "Meets Minus" ranking, White did not receive as a high of a pay increase as he would have if he had received the "Meets" evaluation to which he claims he was entitled. Baxter's own 2004 PMO Grid clearly indicates that a TCS with a "Meets Minus" evaluation will receive only a two percent or less pay raise whereas a TCS with a "Meets" evaluation will receive a three percent pay raise. *See* J.A. at 673. Moreover, at his deposition, White testified that he did not receive as high of a pay raise as he should have for the 2004 fiscal year:

> Q:     What are the financial consequences if you get a does not meet [on your performance evaluation]?
>
> A:     There's no increase [in your salary].
>
> Q:     And if you get a meets, what happens?
>
> A:     You get an increase.
>
> Q:     If you get a meets minus, what happens, do you get an increase?
>
> A:     I believe you get less of an increase that you would if it was a meets.
>
> Q:     Did you get an increase from 2004 –
>
> A:     I did get an increase.

Q:　　I'm sorry, you did?

A:　　I did, but not the increase if it would have been a meets outside those extenuating circumstances that affected my territory.

J.A. at 137. Viewing this evidence in the light most favorable to White suggests that, while White did receive an increase in his salary based upon his 2004 job performance, the increase was not as large as it would have been if White had received a better performance evaluation.

We find this evidence sufficient to convince a reasonable jury that White's allegedly downgraded performance evaluation caused him to suffer "a significant change in benefits." *Ellerth*, 524 U.S. at 761. By receiving a lower salary increase than he would have without the more negative evaluation, White was denied an increase in pay to which he allegedly was entitled. Under our precedent, such a deprivation of increased compensation does constitute an adverse employment action. *See Clay*, 501 F.3d at 710 (holding that "deprivation of increased compensation as the result of a failure to train constitutes an adverse employment action"); *Jordan v. City of Cleveland*, 464 F.3d 584, 596 (6th Cir. 2006) ("[D]enial of money would more than amply qualify as a materially adverse action to any reasonable employee for Title VII purposes."); *Nguyen v. City of Cleveland*, 229 F.3d 559, 565 (6th Cir. 2000) (accepting that the denial of the proper pay increase with the plaintiff's promotion constituted an adverse employment action); *see also Fierros v. Texas Dept. of Health*, 274 F.3d 187, 193 (5th Cir. 2001) (finding that denial of a pay increase can constitute an adverse employment action). Thus, White's evidence does suggest that he has suffered a "tangible employment action" as a result of his downgraded performance evaluation. *Morris*, 201 F.3d at 798. At minimum, White has produced enough evidence to create a genuine issue of material fact regarding whether the downgraded performance evaluation in this case had an "adverse impact" on his receipt of "wages or salary." *Tuttle*, 474 F.3d at 322. Accordingly, we hold that White has produced sufficient evidence for a reasonable jury to conclude that he suffered an adverse employment action in the form of his downgraded 2004 performance evaluation.

### b.　　Race as a Motivating Factor

The second issue we must consider with regard to Baxter's summary judgment motion is whether White has presented evidence from which a jury could reasonably infer that White's race was a motivating factor in the issuance of his downgraded 2004 performance evaluation. As Phillips was the Baxter supervisor responsible for evaluating White's 2004 performance, the question becomes whether there is sufficient evidence for a jury to conclude that Phillips' decision to give White a "Meets Minus" rating was motivated by the fact that White is an African-American. We find that White has satisfied his minimal burden of production on this issue.

At the outset, we note that White has produced sufficient evidence to suggest that Phillips harbors a discriminatory animus toward African-Americans. Indeed, the record reflects that Phillips has made several comments – such as his statement that "nobody wants to be around a black man" – that a jury could reasonably find to be indicative of racial bias. J.A. at 106. The more difficult question, however, is whether White has produced evidence from which a jury can logically infer that Phillips' racial animus was a motivating factor in his evaluation of White's 2004 job performance. White's evidence in support of such a conclusion stems from his claim that Phillips applied the wrong standard to evaluate his 2004 performance. White argues that he was entitled to have his performance evaluated under the 2004 PMO Grid, as opposed to the criteria in the Gold E-Mail, which Phillips claims he used to evaluate White's performance. White alleges that, while the 2004 PMO Grid was applied across the board to Baxter's other employees, the Gold E-Mail was exclusively applied to him. From Phillips' failure to apply the allegedly correct standard (the 2004 PMO Grid) and his decision to apply a harsher standard (the Gold E-Mail), White argues, a jury can reasonably infer that Phillips was motivated, at least in part, by racial animus when issuing White

a "Meets Minus" rating. We agree with White that a jury could draw such an inference from the evidence presented.

White correctly contends that under the terms of the 2004 PMO Grid, which was issued in November of 2004, he was entitled to a "Meets" evaluation. This 2004 PMO Grid specifies that achievement of one hundred percent of the sales target in two of four products, one of which "must be Suprane *or* Brevibloc," equals a "Meets" rating. J.A. at 672 (emphasis added). In 2004, White's year end sales numbers were the following: Suprane, 92%; Brevibloc, 105%; TDS, 101%; and PSA, unknown. Thus, White did achieve over one hundred percent in two of four products, one of them being Brevibloc. Under the plain terms of the 2004 PMO Grid, White should have received a "Meets" evaluation. Accordingly, a jury could reasonably find Phillips' failure to issue such an evaluation suspect, and thus indicative of the presence of an improper motivation – such as racial animus – for the performance evaluation decision.

However, Baxter contends that the 2004 PMO Grid must be read in light of the Gold E-Mail which was circulated to all Regional Managers, including Phillips, on October 22, 2004. The Gold E-Mail emphasized the importance of increasing sales numbers for Suprane and directed that if certain sales representatives, including White, did not "bring their numbers up to a minimum of 95% to plan" by the end of the year then they would "receive a 'DOES NOT MEET' on their PMO, receive a '0' and be placed on a [Performance Improvement Plan]." Evaluated under this standard, as Baxter claims it should be, White's 2004 performance would have merited a "Does Not Meet" rating because White ended the year only ninety-two percent to plan on his Suprane sales.

Nevertheless, in response to Baxter's position, White has introduced evidence which might reasonably convince a jury that the 2004 PMO Grid, and not the Gold E-Mail, was the standard Phillips was supposed to use to evaluate the performance of Baxter sales representatives. First, White points to the testimony of Kunz, who explained that the PMO Grid "matrix" is used to "produce a rating" for a sales representative's performance evaluation.[11] J.A. at 603. Next, White emphasizes that the 2004 PMO Grid was created after the Gold E-Mail and thus should be viewed as controlling. Finally, White provides examples of other Baxter employees whose performance appears to have been evaluated pursuant to the 2004 PMO Grid.

In particular, White points to the performance evaluations of Linda Assoey, Stacey Hord, Peter Moe, Theodore Quinn, Carey Redd, Lawrence Rome, and Melissa Slyvester, who were all supervised by regional managers other than Phillips.[12] Like White, each of these sales

---

[11]The full context of the above-quoted language from Kunz's deposition is much more illustrative of the role the PMO Grid serves in performance evaluations:

> Q:     I guess one thing I'm trying to determine is, does there ever come a time within these PMOs or otherwise where you set a hard and fast number, for instance, if sales representative Y doesn't achieve X percent of budget in a given product, that sales representative is going to receive a meets minus for a given year?
>
> A:     Yes. As I said, what we do is put together basically a matrix or a guideline that includes all products based upon their specific goals and their rating and then specific territory would fall somewhere within that and as a result, *it would produce a rating*.

J.A. at 603 (emphasis added). Viewed in the light most favorable to White, this colloquy does suggest that the PMO Grid serves as the basis for a Baxter employee's performance rating.

[12]White also directs our attention to the performance evaluations of Stephen Morris ("Morris") and Theresa Thomas ("Thomas"), who, like White, were supervised by Phillips. Both Morris and Thomas received "Meets" evaluations for 2004. As White correctly notes, these evaluations were consistent with the 2004 PMO Grid because both

representatives achieved less than ninety-five percent of their Suprane goal. However, rather than being given a "Does Not Meet" rating for failing to achieve more than ninety-five percent of their Suprane goal, as would be required under the terms of the Gold E-Mail, these sales representatives received "Meets Minus" ratings. White correctly observes that, in each case, the "Meet Minus" rating given was consistent with the 2004 PMO Grid.[13] Such evidence reasonably suggests that the 2004 PMO Grid, rather than the Gold E-Mail, was the standard actually applied for these performance evaluations.

Considering all of this evidence in the light most favorable to White, as we must, we find that there is a genuine issue of fact concerning which standard – the 2004 PMO Grid or the Gold E-Mail – Phillips should have used to evaluate White's 2004 performance. If the jury were to conclude, as it reasonably could based on the evidence presented, that the 2004 PMO Grid was the appropriate standard, then it could legitimately infer from Phillips' failure to apply this correct standard that an impermissible factor – namely White's race – served as at least a partial motivation for his decision to issue White a "Meets Minus" performance evaluation. Thus, we find this disputed issue of fact to be material, and we hold that Baxter is not entitled to summary judgment on White's downgraded performance evaluation claim.

Because White has produced sufficient evidence for a reasonable jury to conclude in his favor on both his single-motive and mixed-motive race discrimination claims, we find that he is entitled to present these claims to a jury and accordingly remand the case to the district court for trial. As the issue of what damages White may be entitled to should he prevail on his claims at trial has not been briefed by the parties and is not presented in this summary judgment challenge, we express no view with regard to it.[14]

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is **REVERSED,** and the case is remanded to the district court with instructions to permit White to present his race discrimination claims to a jury.

---

Morris and Thomas had achieved over one hundred percent in two of the four product categories. However, unlike White, Morris and Thomas each achieved over one hundred percent for Suprane, with their other one hundred percent category being TDS. Thus, while the "Meets" ratings given to Morris and Thomas are consistent with an evaluation of their performance under the 2004 PMO Grid, these ratings are also consistent with an evaluation of their performance under the Gold E-Mail. Accordingly, we agree with Baxter, that Morris' and Thomas' evaluations do not necessarily imply that the 2004 PMO Grid, as opposed to the Gold E-Mail, was the standard actually used to evaluate other Baxter employees' performance.

[13]White also contends that the fact that he was given a "Meets Minus" rating as opposed to the "Does Not Meet" rating that would have been dictated by the Gold E-Mail further undermines Baxter's claim that the Gold E-Mail contained the standard which Baxter Regional Managers were supposed to apply. We are unpersuaded by this argument. A careful reading of Phillips' actual evaluation of White demonstrates that Phillips was applying the standard enunciated in the Gold E-Mail, but that he chose to depart upward from it. *See* J.A. at 670 ("Based on Todd's quantitative results, Todd has achieved a rating of 'Does Not Meet'. However, due to Todd''s [sic] diligence and commitment to the business that has been demonstrated by his focus on Suprane and his consistent work in the Region, I have moved this rating to a Meets(-)."). Accordingly, we do not find that White's performance evaluation alone would convince a reasonable jury that the Gold E-Mail was not the standard actually being applied to evaluate Baxter sales representatives' performance.

[14]We find Judge Gilman's gratuitous discussion about how Baxter may seek to limit White's remedies in this case to be of questionable propriety. *See* Dissenting Op. at 25-26. Without knowing all of the evidence that will be presented by the parties at trial, or how the case will unfold going forward, no judge, on either this Court or the district court, is in a position to opine as to the merits of Baxter's potential affirmative defense or the likely relief available to White should he prevail on his claims. Moreover, the parties' attorneys in this case are not lacking in talent and certainly do not need supererogatory instructions from this Court as to how to best serve their clients on remand.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

RONALD LEE GILMAN, Circuit Judge, concurring in part and dissenting in part. I concur in the majority's conclusion that White has produced sufficient evidence to survive summary judgment on his performance-review claim and I agree with the majority's articulation of the appropriate standard for evaluating Title VII mixed-motive claims that are raised under 42 U.S.C. § 2000(e)-2(m). But I respectfully disagree with the majority opinion to the extent that it permits White's failure-to-promote claim to proceed to trial. In particular, I do not believe that White has raised a genuine issue of material fact as to whether Baxter's proffered reasons for promoting Freed instead of White were pretextual. I will first explain why I reach this conclusion with respect to White's failure-to-promote claim, and will then proceed to make several comments about the mixed-motive claim.

### A.    Failure-to-promote claim

The majority acknowledges, and I agree, that (1) White established a prima facie case of race discrimination on his failure-to-promote claim, and (2) Baxter's proffered reason for failing to promote White (i.e., that Freed was more qualified and better suited to the position) is "facially legitimate and non-discriminatory." Maj. Op. at 8-9. I disagree, however, with the majority's conclusion that White sustained his burden of "produc[ing] sufficient evidence from which the jury may reasonably reject" Baxter's explanation for promoting Freed instead of White. *See Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994).

To carry his burden of demonstrating that Baxter's proffered explanation for promoting Freed was merely a pretext designed to mask discrimination, White must show that this "nondiscriminatory reason: (1) had no basis in fact, (2) did not actually motivate defendant's conduct, or (3) was insufficient to warrant the challenged conduct." *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 258 (6th Cir. 2002). White insists that the district court erred in determining that he had not produced sufficient evidence to permit a jury to find that Baxter's justification for promoting Freed was pretextual. He claims that Baxter's proffered reason must be pretextual because "he was easily the most qualified candidate for the management position and should have received the position." In the alternative, he contends that, at a minimum, the question of pretext should be submitted to a jury. He makes three specific arguments in support of his position: (1) that Freed had never actually sold Baxter's proprietary products, while White had seven years of sales experience and a "sterling sales record," (2) that Baxter overstated Freed's management experience because during her interview she described an incident in which she "admittedly feared confronting" a subordinate employee about his chronic tardiness, and (3) that White was the only candidate who had a master's degree.

In response to White's first argument, uncontroverted evidence in the record shows that although Freed did not have experience selling Baxter's proprietary products, she did have extensive prior experience selling proprietary pharmaceuticals for other companies. Freed also attended all of the training classes on Baxter's proprietary products, designed and implemented sales-training programs, and taught new sale representatives about the proprietary products. These undisputed facts, combined with evidence in the record that Freed actually discussed ideas for improving sales in the relevant region during her interview for the position, casts considerable doubt on the majority's unsupported statement that she, "in all likelihood, was less familiar than was White with the specific challenges faced by the ACCO division in promoting Baxter's products." Maj. Op. at 11.

The majority also states that White's master's degree and prior management experience could lead a jury to conclude that Baxter's legitimate nondiscriminatory reason for promoting Freed instead of White was pretextual. Maj. Op. at 10. To the contrary, I do not believe that the evidence on which White and the majority rely in support of this conclusion creates a genuine issue of material fact as to whether Baxter's assertion that Freed was better qualified for the Regional Manager position "has no basis in fact, did not actually motivate Baxter's decision, or is not sufficient to explain its hiring choice." Maj. Op. at 11.

The recognition that White had more experience selling Baxter's products and has a master's degree in business management does not necessarily show either that Freed was less qualified than White or that Baxter's decision was not actually based on a reasonable determination of the candidates' relative qualifications. Baxter in fact put forth an abundance of evidence showing not only that Freed was well qualified for the position, but also that the three interviewers unanimously believed that she better displayed the qualities of a good manager. The interviewers specifically testified that they had considered Freed's lack of experience in selling Baxter's products, but believed that this deficit was outweighed by her general sales background, her participation in numerous training classes, and her experience in teaching sales representatives about the products.

White's contention that he was more qualified than the other candidates because he has a master's degree is likewise unpersuasive, particularly in light of the interviewers' testimony that they found White's personality to be off-putting and incompatible with the type of interactions that a manager would be required to have with sales representatives. Although the majority is surely correct that "any evaluation of White's interview performance is an inherently subjective determination," Maj. Op. at 10, such determinations are also inevitably a part of the hiring and promotion decisions that employers must make in the course of business. To the extent that these subjective determinations may be "easily susceptible to manipulation in order to mask the interviewer's true reasons for making the promotion decision," *id.*, such a concern has no place in the present case, where White himself concedes that he has no reason to believe that any of the interviewers held any discriminatory animus against African-Americans. This concession is all the more significant considering the uncontroverted fact that each interviewer rated Freed first and White last among the five candidates interviewed for the managerial position.

The assertion by White that the interviewers could not have believed that Freed was qualified because she admitted that she had once been nervous about confronting a subordinate is simply without merit. Not only does such evidence fail to demonstrate that Freed was unqualified for the management position (especially given that Freed went on to explain that she had effectively dealt with the employee in question), but the anecdote does nothing to undermine Baxter's argument that the interviewers acted reasonably in concluding that Freed had substantially more management experience than White.

In short, I do not believe that White has produced any evidence showing that Baxter's choice of Freed over White was anything other than a "reasonably informed and considered" business decision. *See Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). I am also troubled by the majority's conclusion that "White's arguably superior qualifications . . . , in and of itself, could lead a jury to doubt the justifications given for Baxter's hiring decision." Maj. Op. at 10. Such a holding ignores this court's decision in *Smith* and goes a long way towards completely eviscerating the business-judgment rule articulated in that case and reaffirmed in *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576-77 (6th Cir. 2003) (en banc). This court in *Smith* explained that "the key inquiry" in determining whether an employer's proffered good-faith business decision should be given credence is "whether the employer made a reasonably informed and considered decision before taking an adverse employment action." 155 F.3d at 807; *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (permitting an employee to establish pretext "by showing that the employer's proffered explanation is unworthy of credence").

Contrary to the majority's mischaracterization of my analysis, I do not think for a minute that we should "unquestionably accept the employer's own self-serving claim that the decision resulted from an exercise of 'reasonable business judgment.'" Maj. Op. at 9 n.6. Rather, the test articulated in *Smith* requires an independent evaluation of whether the employer's determination was in fact reasonable. *See Wexler*, 317 F.3d at 577 (concluding that genuine issues of material fact precluded a finding that the employer's proffered reason for demoting Wexler was reasonable). But our independent evaluation of the reasonableness of an employer's business judgment does not preclude us from *ever* finding that an employer's proffered justification is reasonable as a matter of law. *See Smith*, 155 F.3d at 808-09 (affirming the grant of summary judgment in favor of the employer where the employee was unable to raise a genuine issue of material fact to dispute the employer's reasonable reliance on the facts before it when making the decision to terminate the employee).

In the present case, the fact that White has adduced evidence showing that he and Freed were both qualified for the Regional Manager position does not create a genuine issue of material fact as to whether Baxter's decision to promote Freed instead of White was unreasonable or ill-informed. *See Vredevelt v. GEO Group, Inc.*, 145 F. App'x 122, 131 (6th Cir. 2005) (noting that the plaintiff's allegation that she was more qualified than the male candidate the company hired was unpersuasive because "[a]t best, the comparison in this case is between two qualified employees").

I also believe that the majority's reliance on *Wexler* is misplaced in light of the factual distinctions between that case and the one before us. In *Wexler*, the employer claimed that Wexler's demotion was based on the store's declining sales under his management. 317 F.3d at 576. This court concluded that application of the business-judgment rule was inappropriate in that case because genuine issues of material fact existed as to the reasonableness of the employer's decision to fault Wexler for the company's declining sales. In particular, this court noted that (1) the company was aware that factors beyond Wexler's control were contributing to the declining revenue, (2) the supervisors who made the decision to demote Wexler had made adverse age-related statements about him, and (3) the company retained one of the employees who eventually replaced Wexler as store manager despite the fact that sales continued to decline under that employee's management. *Id.* at 577.

The recognition by *Wexler* that courts may consider "the reasonableness of an employer's decision" at the pretext stage "to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation," *id.* at 576, is of no help to White in the present case. Here the record clearly shows that the choice of Freed over White was based on a reasonable business judgment that Freed was the most qualified of the five candidates for the Regional Manager position. *See Smith*, 155 F.3d at 807 (permitting employers to make business judgments where those decisions are "reasonably informed and considered").

I believe, in sum, that this court's precedents require more recognition of such business judgments than the majority's decision permits, and that White failed to produce sufficient evidence for a jury to conclude that Baxter's proffered reasons for hiring Freed over White were pretextual. For these reasons, I would affirm the district court's grant of summary judgment as to White's failure-to-promote claim. I therefore respectfully dissent from the majority's resolution of this issue.

**B.    White's downgraded-performance-evaluation claim and the proper summary-judgment framework for mixed-motive claims**

Although I agree with the majority's persuasive and well-reasoned discussion of the appropriate framework for evaluating mixed-motive claims at the summary-judgment stage and concur in the result reached in that portion of the majority opinion, I write separately to comment on the likely effect of the new framework and its application to the specific circumstances of the case before us. In particular, I am wary of the majority's statement that the standard we announce

today "will typically require sending the case to the jury." Maj. Op. at 16. In my view, the standard laid out in the majority opinion must be applied with a view towards the more general principle that summary judgment serves an important screening function in our judicial system. *See Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) ("[S]ummary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial."). District courts reviewing motions for summary judgment on a mixed-motive claim, therefore, must always undertake that analysis with Rule 56 of the Federal Rules of Civil Procedure in mind, which directs courts to grant such a motion where "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Contrary to the majority's suggestion, I believe that the articulated standard leaves ample room for courts to determine that no reasonable jury could conclude that a protected characteristic was a motivating factor in an adverse employment decision.

I also believe that the evidence favoring White in this case is quite weak and just barely passes muster under the new standard that we have articulated. Indeed, the key evidence in the record that supports White's performance-review claim is the collection of remarks allegedly made by Phillips, which—as the district court properly found—seem to evince a racially discriminatory animus. Those alleged remarks, combined with the factual dispute over which criteria should have governed the evaluation of White's performance (the Gold email or the 2004 PMO grid), could lead a jury to infer that race was at least a motivating factor when Phillips chose to partially follow the more stringent requirements of the Gold email.

That inference is not dispelled by any showing in the record that Phillips applied the Gold email to any nonprotected employees, which would render unreasonable the conclusion that Phillips was motivated by race in determining how to properly evaluate White's performance. *See* Maj. Op. at 16 (noting that "the court should also consider evidence presented by the employer that the protected characteristic was *not* a motivating factor for its employment decision" (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 720 (6th Cir. 2006) (Moore, J., concurring)). Nevertheless, in the absence of Phillips's alleged racist remarks, I would have concluded that there was no basis for a jury to find that race was "a motivating factor" in the downgraded performance review received by White.

White's claim would certainly fail under the more stringent *McDonnell Douglas* framework used to evaluate claims brought under Title VII's general antidiscrimination provision, 42 U.S.C. § 2000e-2(a)(1), if for no other reason than that he has failed to show that any similarly situated employee was treated more favorably than he was with respect to performance evaluations. So although I concur in the majority's explanation of why this type of evidence should not be required to survive summary judgment on a mixed-motive claim, there is no question that White would have a much stronger case to present to a jury if there was such evidence in the record. I therefore find myself barely persuaded that a genuine issue of material fact exists as to whether race was a motivating factor in White's performance review, but I would not be at all surprised if a jury ultimately finds to the contrary.

Finally, I would note that the remedy-limitation provision contained in 42 U.S.C. § 2000e-5(g)(2)(B) may prove to be particularly important in the instant case. That provision provides an employer with a "limited affirmative defense that does not absolve it of liability, but restricts the remedies available to a plaintiff. The available remedies include only declaratory relief, certain types of injunctive relief, and attorney's fees and costs." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94 (2003). In the present case, Baxter may well be able to show that White would have received a downgraded performance review even in the absence of the impermissible consideration of race, in which case it could successfully assert the § 2000e-5(g)(2)(B) affirmative defense. *See* § 2000e-5(g)(2)(B) (explaining that the limitation-of-remedies provision applies where "an individual proves a violation under section 2000e-2(m) of this title and a respondent demonstrates

that the respondent would have taken the same action in the absence of the impermissible motivating factor").

The evidence in the record relating to the Gold email and White's failure to meet his Suprane sales goals will be highly relevant to this showing. Moreover, the jury could easily conclude that Phillips "split the difference" between the criteria contained in the 2004 PMO Grid and the Gold email, giving White a *more* favorable review than he would have received upon a straightforward application of the criteria set forth in the Gold email. If Baxter chooses to proceed in this way and the jury finds that the company would have downgraded White's performance review even in the absence of any impermissible consideration of White's race, then the remedies available to White will be considerably limited. He would under such circumstances be entitled to declaratory and perhaps limited injunctive relief, and to "attorney's fees and costs demonstrated to be directly attributable only to the pursuit of" the mixed-motive claim. *See* § 2000e-5(g)(2)(B)(i). If this is indeed the ultimate outcome, then the district court would be unable to "award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment." § 2000e-5(g)(2)(B)(ii). Section 2000e-5(g)(2)(B) thus provides an important counterbalance to the relatively lenient summary-judgment standard that we announce today, and may be particularly applicable in the present case.