# STATE OF MICHIGAN

# COURT OF APPEALS

DARBY J. O'DELL,

        Plaintiff-Appellant,

v

STATE OF MICHIGAN, DEPARTMENT OF
STATE POLICE, F/LT KEVIN SWEENEY, F/LT
JOHN CARD, F/LT MITCH KRUGIELKI, F/LT
TONY CUEVAS, F/LT MATT BOLGER, F/LT
ANN MCCAFFERY, F/LT PHILLIP MENNA,
F/LT MICHAEL SHAW, F/LT GARY
PARSONS,

        Defendants-Appellees.

UNPUBLISHED
February 1, 2018

No. 334146
Wayne Circuit Court
LC No. 14-012273-CD

Before: MURRAY, P.J., and FORT HOOD and GLEICHER, JJ.

GLEICHER, J. (*dissenting*).

Plaintiff Darby O'Dell, a female Michigan State Police trooper, applied nine times for a sergeant's position. She was rejected every time. O'Dell had passed the sergeant's examination and was otherwise qualified to work as a sergeant; indeed, she was a sergeant for almost a year, until a 2007 state-wide reduction in force eliminated many sergeant positions.

Between December 2011 and April 2013, O'Dell was granted five interviews for open sergeant positions. She entered the interviews with qualifications that exceeded those of other troopers interviewed. She never received a promotion; male troopers with lesser qualifications did. The interviews made all the difference.

The majority holds that O'Dell failed to rebut the nondiscriminatory reasons offered by defendants for their failure to promote her. I respectfully disagree. In my view, O'Dell has met her burden at the summary disposition stage by creating a reasonable inference that defendants' reasons for failing to promote her were pretextual. I would reverse and remand for further proceedings.

## I. THE MSP HIRING PROCESS

Application for a sergeant's position in the MSP begins with the candidate's online submission of a résumé, transcripts, performance appraisals, an application memorandum, and an

- 1 -

endorsement from the applicant's post commander.  A hiring manager uses this information to prepare a "sergeant candidate comparison grid," which ranks the applicants based on the sum of three different scores.  The first score represents an applicant's years of seniority (an objective measure), the second his or her educational background (also objective), and the third, called "job fit," combines objective and subjective elements.  An "initial total score" is calculated by adding together these three data points.

The job fit form is the only element of the initial scoring process that includes an exercise of personal judgment.  A job fit calculation evaluates an applicant's training, work experience, performance appraisals, written communication skills, and "leadership."  The hiring manager scores points under each category based on information derived from the candidate's written submissions.  For example, under "training," the job fit form allows an applicant to score a point for "specialized training" and another point for having been "a department instructor or instructor trainer."  Under "written communications," the job fit form permits two points if the overall appearance of the trooper's application memo was "professional looking."  Under "leadership," the form inquires whether the applicant had "demonstrated leadership and the ability to work with others as noticed in his/her background experience."  A positive answer gives the applicant one point.

For the most part, the scoring of the "job fit" form is objective.  But some items, such as the scores for a handful of criteria subsumed under "leadership" or "good report writing skills," introduce a degree of subjectivity.  Nevertheless, that the scoring is performed by a single hiring manager helps increase its reliability as a reasonably objective measure of a trooper's competency for promotion.

The candidates' initial numeric scores (the sum of the scores for seniority, education and job fit) are then compared.  According to the comparison grid, "the top three to five applicants" are interviewed.  The oral interview yields a second score which counts for 60% of the applicant's total score.  The interview scoring is highly subjective.  Interview topics may include "specialized skills and knowledge," "planning and organization," "decision making," "follow-through," "job fit," "contributing to team success," "work standards," and communication."  Although points are given for each category, no description of the unsuccessful candidates' answers is created.

The initial score and the interview score are added, and the candidates re-ranked.  The trooper with the highest score is awarded the promotion.  The hiring manager then issues a memorandum justifying the selection.

## II. O'DELL'S SCORES

O'Dell submitted nine sergeant applications over a 16-month period.  Her first five attempts at promotion resulted in only two interviews.  Although O'Dell's counsel has not provided full data sets regarding these earlier applications, it appears for three of the five positions, O'Dell's preinterview scores did not qualify her for the interview round.[1]  Beginning

---

[1] O'Dell was interviewed with her first application in 2011 for a sergeant's position in Monroe.  Her initial score was 30.  The man hired, Marc Moore, also had an initial score of 30.  Moore

in November 2012, O'Dell applied for four sergeant positions and achieved three interviews. She focuses on the last two of these experiences in identifying pretext.

In February 2103, O'Dell applied for one of two open sergeant positions in Flint. Twenty-seven other troopers also applied. O'Dell's initial score (seniority plus experience plus job fit) totaled 35 points. This placed her third among the 28 applicants. The three male troopers ultimately offered the two positions (one declined it) had initial scores of 36, 32 and 32 points. Thus, before the interviews, O'Dell's scores placed her ahead of two of the successful troopers.[2]

The interviews were conducted by a panel of three male first lieutenants. Although the comparison grid states that "the top three to five applicants will be interviewed," 12 troopers were interviewed. Because there were two open positions, it makes sense to assume that the field was enlarged to six to 10 interviews. The fact that the applicant pool was expanded to 12 bears significance in this case. Two of the male troopers offered sergeant positions (Patrick Darrow and Marcus Trammel) had initial scores of 32. These initial scores were the lowest in the pool of the 12 interviewed applicants. Had 10 candidates been interviewed, Darrow and Trammel would not have made the cut.

Her interview scores again closed O'Dell's door to promotion. She scored a 44. The highest scorer, Darrow, achieved a 54; Scott Adams and Marcus Trammel both scored 52 points. When the interview scores were added to the initial scores, Adams came out on top with 88 points, Darrow had 86, Trammel 84, and O'Dell 79. Darrow declined a position, so Adams and Trammel were appointed.

Objectively, O'Dell was more qualified than Trammel. O'Dell has a relevant masters' degree; Trammel has a bachelor's degree. O'Dell has an additional year of experience. Her job fit score was two points ahead of Trammel's; with an additional point scored for having had instructor experience, she would have beaten his score by three points. The job fit criteria also revealed that O'Dell scored a point for having undergone "the specialized training needed for the position," while Trammel had not, and (unlike Trammel) had "attended a supervisory development or leadership development course of program or completed a department sergeant mentoring program." O'Dell also had firsthand experience as a sergeant.

The differences in the interview scores were also significant. All three men offered a position scored a 10 for "communication;" O'Dell scored an 8. All three men scored an 8 for "stress tolerance;" O'Dell scored a 6. Darrow and Trammel scored a 10 for "decision making;" O'Dell scored a 6, while Adams scored an 8. These criteria are wholly subjective and involve assessments potentially tinged with sexual stereotyping.

received a score of 50 for his interview, while O'Dell's score was 42. O'Dell lost points for "planning and organization," "decision making," "follow-through, and "job fit." Moore did well on these indices.

[2] O'Dell asserts that an error calculating her "job fit" total would have brought her to 36 points, tying her score with that of the highest-scoring applicant. The MSP has not disputed this contention.

Undeterred by her failure in Flint, O'Dell applied for a sergeant's position in Monroe. This time, O'Dell entered the interview process tied with one other trooper for the highest initial score of any of the eight candidates.[3] In this regard, she beat the successful applicant, Trooper James Jarrett, by three points; Jarrett scored zero points for education or military background. A panel of three male first lieutenants conducted the interviews. Notably, six candidates were interviewed rather than five. Jarrett had the lowest initial score of the six interviewees. If only "three to five" people had been interviewed, consistent with the comparison grid's representation, Jarrett would not have been entitled to an interview.

Predictably, O'Dell's total score suffered because of the interview. O'Dell scored a 36, the lowest of the interviewees; Jarrett scored a 54. The interview evaluation form reveals noteworthy scoring differences. O'Dell got 4 points for "decision making;" Jarrett received 8. Jarrett scored 10 points for "contributing to team success;" O'Dell got 6. Jarrett was awarded 10 points for "job fit," while O'Dell received only six.

Viewed in the light most favorable to O'Dell, this evidence supports three relevant evidentiary inferences. First, the final two promotion decisions rested solely on *subjective* perceptions flowing from O'Dell's interviews. Second, viewed objectively, O'Dell was more qualified than the troopers promoted to the last two positions for which she applied. Third, defendants purposefully disregarded or altered their "top three to five applicant" interview policy to include three male troopers—Darrow, Trammel and Jarrett—who ultimately received promotions.

## III. GOVERNING LEGAL PRINCIPLES

The Civil Rights Act forbids employers from discriminating against individuals with respect to employment, compensation, or a term, condition, or privilege of employment, because of sex. MCL 37.2202(1)(a). In a case built on circumstantial evidence such as this one, we evaluate the plaintiff's evidence under the burden-shifting framework set forth in *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973). *McDonnell Douglas* allocates the burden of production and dictates the order of presentation of proof in discrimination cases. *St Mary's Honor Ctr v Hicks*, 509 US 502, 506; 113 S Ct 2742; 125 L Ed 2d 407 (1993). The first step is the establishment of a prima facie case.

A plaintiff presents a rebuttable prima facie case of unlawful discrimination by showing that (1) she belonged to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) she was treated less favorably than similarly situated male employees. *Wright v Murray Guard, Inc*, 455 F3d 702, 707 (CA 6, 2006). This burden "is not onerous." *Texas Dep't of Community Affairs v Burdine*, 450 US 248, 253; 101 S Ct 1089; 67 L Ed 2d 207 (1981).

The majority acknowledges that defendants did not challenge O'Dell's prima facie showing in this Court or in the trial court. Nor could they have credibly done so, as it is plain that she established a prima facie case. I highlight this point because O'Dell's prima facie proofs remain relevant to the issue of pretext:

---

[3] The trooper with the highest score declined an interview.

- 4 -

[A]lthough the presumption of discrimination "drops out of the picture" once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case "and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." [*Reeves v Sanderson Plumbing Prods, Inc*, 530 US 133, 143; 120 S Ct 2097; 147 L Ed 2d 105 (2000) (citations omitted).]

Defendants offered a facially nondiscriminatory explanation for promoting troopers other than O'Dell: the men scored better on their interviews. The issue presented on summary disposition was whether viewed in the light most favorable to O'Dell, the record contains sufficient evidence for a reasonable jury to find that this reason actually functioned as a pretext for discrimination. Another way of asking this question is: has O'Dell presented evidence rebutting the truth or the validity of defendants' rationale—interview performance—for repeatedly passing her over for promotion?

Although the ultimate question at a trial is whether O'Dell proved gender discrimination, at the summary disposition stage her burden is to bring forward evidence casting doubt on defendants' reason for promoting others, and raising a credible inference that defendants harbored discriminatory animus:

> The inquiry at this final stage of the *McDonnell Douglas* framework is exactly the same as the ultimate factual inquiry made by the jury: whether consideration of a protected characteristic was a motivating factor, namely, whether it made a difference in the contested employment decision. The only difference is that, for purposes of a motion for summary disposition or directed verdict, a plaintiff need only create a question of material fact upon which reasonable minds could differ regarding whether discrimination was a motivating factor in the employer's decision. [*Hazle v Ford Motor Co*, 464 Mich 456, 466; 628 NW2d 515 (2001).]

A question of material fact may arise when, in combination with the evidence giving rise to the plaintiff's prima facie case, an employer's explanation lacks credibility. The United States Supreme Court highlighted this point in *Reeves*, 530 US at 147:

[I]t is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. Specifically, we stated:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.

Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. In appropriate circumstances, the trier of fact can

reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." [Citations omitted, emphasis in original.]

"[A] invidious [discriminatory] purpose may often be inferred from the totality of relevant facts." *Washington v Davis*, 426 US 229, 242; 96 S Ct 2040; 48 L Ed 2d 597 (1976). A court's assessment "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Hts v Metro Housing Dev Corp*, 429 US 252, 266; 97 S Ct 555; 50 L Ed 2d 450 (1976).

In my view, O'Dell's evidence meets the evidentiary threshold required to proceed to trial. Indisputably, she was qualified to serve as a sergeant. The process in which promotion decisions were made involved a combination of objective and subjective criteria. Objectively, O'Dell was significantly more qualified than the three troopers who beat her for promotion in 2013. Subjectively, the male interviewers judged her less qualified than her competitors, and those unexplained, subjective determinations sealed her fate.

The majority emphasizes that defendants prepared memoranda summarizing the interview results, and that those memos adequately justified the decisions to promote troopers other than O'Dell. I find nothing particularly persuasive, or even enlightening, in the memos. For example, the summary regarding Scott Adams is largely conclusory:

Tpr. Adams' experience with the local police departments and local commanders in the Genesee County area provides him with the ability to easily transition to a leadership position at the post. He has demonstrated sound decision making skills by proving [sic] relevant and well described examples during the interview. He identified high performing work standards when asked to provide information about his area. Tpr. Adams discussed significant abilities to manage stress as well. His interview answers indicate the sergeant position at the Flint Post will be an excellent job fit.

So is the review of Trooper Jarrett's interview performance:

During the interview process, Trooper Jarrett stood out among the other candidates with his strong verbal communication skills and outstanding work examples provided for each question. Panel members unanimously rated him the highest candidate during this process, as noted on the PD-11 Interview Evaluation document.

These summaries recite conclusions rather than facts, and provide no information at all about O'Dell's interview performance and why the male lieutenants out-scored her in the ways they did. No evidence allows us to compare the candidates' answers. Without that information, it is simply impossible to hold, as does the majority, that defendants' interview-based justifications were reasonable as a matter of law. The majority's analysis amounts to immunity from

discrimination review when an employer relies on unrecorded, poorly documented, summarily-described interviews as the critical factor for promotional opportunities.

"Courts have frequently noted that subjective evaluation processes intended to recognize merit provide ready mechanisms for discrimination." *Grano v Dep't of Dev of City of Columbus*, 699 F2d 836, 837 (CA 6, 1983). While the use of interviews is commonplace in employment decision-making, promotions based on subjective judgments made during interviews may render those judgments less than credible. The majority brushes aside O'Dell's argument that the subjective nature of the interviews, combined with her superior objective scores, permits a reasonable inference of discrimination. The law, however, supports that under some circumstances, qualification evidence alone may supply evidence sufficient to defeat summary disposition, particularly when other facts suggest that an employer's explanation is unworthy of credence. Here, that evidence comes from the facts giving rise to the prima facie case, her objectively superior qualifications, the unexplained expansion of the interview pool, and the absence of any explanation for ranking O'Dell so far below the male troopers in so many interviews.

The United States Supreme Court has held that "qualifications evidence may suffice, at least in some circumstances," to show that an employer's explanation action is a pretext for discrimination. *Ash v Tyson Foods*, 546 US 454, 457; 126 S Ct 1195; 163 L Ed 2d 1053 (2006). Endorsing language advanced by the District of Columbia Circuit, the Sixth Circuit has embraced the notion that a reasonable jury could disbelieve that O'Dell performed more poorly during the interviews than her male colleagues:

> "If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate—something employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture." [*White v Baxter Healthcare Corp*, 533 F3d 381, 393-394 (CA 6, 2008), quoting *Aka v Washington Hosp Ctr*, 156 F3d 1284, 1294 (DC Cir, 1998).]

The record demonstrates that O'Dell was highly qualified for a sergeant position; in addition to her high scores for seniority, education, and job fit, she had actually *been* a sergeant. Yet based solely on interviews conducted by six male lieutenants, three male troopers with objectively lesser qualifications were hired. The memoranda explaining the interview scores omit any mention of O'Dell's performances, focusing only on the "winners." But the memoranda tell us very little about why the answers supplied by the men were better or stronger than those offered by O'Dell.

Viewing the evidence in the light most favorable to O'Dell, I believe that a jury could reasonably disbelieve that O'Dell—an experienced and accomplished trooper—did so poorly during her interviews that she talked herself out of three chances at promotion. In finding a fact question regarding pretext in *White*, 533 F3d at 394, the Sixth Circuit elaborated:

> [A]ny evaluation of White's interview performance is an inherently subjective determination, and thus easily susceptible to manipulation in order to mask the

interviewer's true reasons for making the promotion decision. Indeed, since the very issue in dispute is whether the reasons given by these interviewers for their decision should be believed, it would be highly inappropriate for us to assume . . . that their own subjective perceptions of White were accurate.[4]

In conjunction with the evidence comprising O'Dell's prima facie case—nine rejections within 16 months—I believe that O'Dell has put forward sufficient evidence to suggest that the discrepancies between her interview scores and those of the male troopers were indicative of bias or, alternatively, that the interview memoranda did not sufficiently explain defendants' hiring choices.

This Court has recognized and validated precisely the same analysis that I advance. In *Campbell v Human Services Dep't*, 286 Mich App 230; 780 NW2d 586 (2009), we examined whether the plaintiff's evidence sufficed to establish a prima facie case of discrimination. We trained our sights on the last element of that test: whether "the job was given to another person under circumstances giving rise to an inference of unlawful discrimination." *Id*. at 240 (quotation marks and citation omitted). We found this element established, explaining:

> Viewing the evidence in the light most favorable to plaintiff, a rational trier of fact could reasonably infer, from the multiple times that plaintiff was not chosen for a position for which she was qualified and that was filled by a male, and in some cases by a male less qualified than plaintiff, that gender was a motivating factor in defendant's decision not to promote plaintiff to the Arbor position. [*Id*.]

The majority proclaims that because this analysis arose in the context of evaluating the plaintiff's prima facie case rather than the third aspect of the *McDonnell Douglas* burden shifting framework, it lacks relevance. The majority ignores, however, that an inference of unlawful discrimination may arise *from the same evidence*. In *Reeves*, 530 US at 149, the United States Supreme Court rejected "the premise that a plaintiff must always introduce additional, independent evidence of discrimination" beyond the prima facie case to prove pretext. "In evaluating pretext and the plaintiff's ultimate burden, the court should consider all evidence in the light most favorable to the plaintiff, including the evidence presented in the prima facie stage." *Provenzano v LCI Holdings, Inc*, 663 F3d 806, 812 (CA 6, 2011). In evaluating the evidence, we must look at the record as a whole, considering "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a

---

[4] The majority distinguishes *White* with the statement that the record in that case "was . . . replete with independent evidence of discriminatory animus toward the plaintiff and other African-American employees at the company." The evidence of discriminatory animus was not relevant to the plaintiff's failure to promote claim, however, as no evidence apparently existed that the promotional decision-makers were infected with that animus. Nor does the opinion reference any expressed discriminatory bias as a basis for upholding the validity of the plaintiff's failure to promote claim. Rather, the Sixth Circuit relied on the racist comments made by one of White's supervisors in evaluating his "downgraded performance evaluation claim." See *White*, 533 F3d at 404. *White* supports and informs my analysis and, contrary to the majority, is not meaningfully distinguishable from this case.

motion for judgment as a matter of law." *Reeves*, 530 US at 148-149. The inference of discrimination created by O'Dell's prima facie proofs—nine rejections in favor of male troopers in nine attempts—also supports an inference that her last two rejections were pretextual.

The majority holds that the interview scores conclusively established a legitimate, nondiscriminatory reason for defendants' failure to promote O'Dell. I would hold that the evidence of an irregular interview selection process combined with O'Dell's objectively superior qualifications and the fact that she was repeatedly passed over for promotion in favor of males gives rise to an inference of discrimination that permits her to survive summary disposition. As the Sixth Circuit put it in *White*, 533 F3d at 394, "since the very issue in dispute is whether the reasons given by these interviewers for their decision should be believed, it would be highly inappropriate for us to assume . . . that their own subjective perceptions of White were accurate."

Defendants contend that the interviews sorted out the best qualified applicants in a nondiscriminatory fashion. They have provided no actual evidence of that, however. And contrariwise, O'Dell points to her superior qualifications, the unexplained enlargement of the interview pool, her repeated failures to achieve promotion despite having served as a sergeant, and the inherent subjectivity of an interview process that in the last two instances, at least, involved only male officers. I would hold that this evidence creates a material issue of fact upon which reasonable minds could differ regarding whether discrimination motivated defendants' ultimate choices, and respectfully dissent.

/s/ Elizabeth L. Gleicher